IN RE: GORDON M. WILKINS, M.D.

No. 39

(Filed 17 April 1978)

1. **Physicians, Surgeons, and Allied Professions § 6.1— hearing to revoke medical license—procedural due process**

    Respondent was not denied procedural due process in a hearing to revoke his license to practice medicine where he was notified in writing of the charges against him, was given ample time in which to prepare his defense, was present in person and represented by able counsel of his choice at the hearing, was confronted by his accusers, was given ample opportunity to cross-examine them and testified in his own behalf.

2. **Physicians, Surgeons, and Allied Professions § 6— drug prescriptions not for legitimate medical purpose—vague-overbroad challenge to statute and order**

    Since charges brought against a physician for prescribing controlled substances outside the course of the legitimate practice of medicine and not for any legitimate medical purpose have no relation to any of the freedoms protected by the First Amendment of the Constitution, the physician's "vague-overbroad" challenge to the statute under which the Board of Medical Examiners acted and a prior order of the Board suspending the revocation of his license is not to be weighed in the delicate scales used in cases where First Amendment freedoms are at stake.

3. **Physicians, Surgeons, and Allied Professions § 6— revocation of medical license—statute and suspension of revocation—test for vagueness and over-breadth**

    In the application of a statute authorizing the revocation of a license to practice medicine or any order suspending the revocation of such license to subsequent medical practice by a licensee, not involving his First Amendment freedoms, the facts of the case must determine the decision of the courts as to vagueness and over-breadth, and the test is whether a reasonably intelligent member of the profession would understand that the conduct in question is forbidden.

4. **Physicians, Surgeons, and Allied Professions § 6— revocation of medical license—constitutionality of statute and order suspending revocation**

    A statute authorizing the revocation of a physician's license to practice medicine for "unprofessional or dishonorable conduct unworthy of, and affecting, the practice of his profession," former G.S. 90-14, and an order of the Board of Medical Examiners suspending the revocation of a medical license upon the condition that the physician "conduct his practice of medicine in accordance with proper professional and ethical standards" are not unconstitutionally vague and overbroad when applied to the actions of a physician in prescribing highly dangerous controlled substances for complete strangers without making any examination of such patients or any inquiry as to their medical history or current symptoms and complaints, since it is obvious that

any reasonably intelligent physician would know that such actions would constitute a violation of the statute and order.

5. **Physicians, Surgeons, and Allied Professions § 6— authority to suspend revocation of medical license**

The Board of Medical Examiners had authority to suspend its order of revocation of a physician's license upon the condition that the physician "not violate a State or Federal law."

6. **Physicians, Surgeons, and Allied Professions § 6.2— proceeding to revoke medical license—breach of N. C. law—quantum of proof**

Since a proceeding before the Board of Medical Examiners for the revocation of a physician's license on the ground that he has breached a condition of a prior, suspended order of revocation that he not violate a State or Federal law is a civil proceeding, such breach of the condition of suspension does not have to be shown beyond a reasonable doubt, but only by a preponderance of the evidence. Therefore, the Board of Medical Examiners could properly find that a physician violated the laws of N. C. by writing prescriptions for controlled substances outside the course of professional practice and not for a legitimate medical purpose, although criminal charges against the physician based on such prescriptions were dropped when his trial ended in a mistrial.

7. **Physicians, Surgeons, and Allied Professions § 6.2— revocation of medical license—prescriptions for drugs not for legitimate medical purpose—sufficiency of evidence, findings, conclusions**

Evidence before the Board of Medical Examiners supported the Board's findings that respondent physician in six instances prescribed the controlled substances Didrex, Desoxyn or Butacaps for complete strangers "without determining whether or not such drugs were necessary for the treatment of any ailment or disease and not for any legitimate medical purpose and not in the course of the legitimate practice of medicine," such findings supported the Board's conclusions that such conduct constituted a violation of the laws of North Carolina, constituted dishonorable and unprofessional conduct affecting the practice of medicine, and constituted a violation of a condition of the suspension of a prior revocation of respondent's license, because of a felony conviction, that he violate no State or Federal law, and such conclusions supported the order of the Board revoking respondent's license to practice medicine in North Carolina.

8. **Physicians, Surgeons, and Allied Professions § 7— revocation of medical license—absence of racial discrimination—denial of motion for remand**

The superior court did not err in the denial of respondent physician's motion to remand a license revocation proceeding to the Board of Medical Examiners for further proceedings on the ground that the Board's revocation of respondent's license to practice medicine was racially motivated where respondent made no preliminary showing of any basis for his accusation of racial discrimination, and the record clearly shows that the revocation of respondent's license was not due to prejudice against members of his race.

APPEAL by respondent from *Griffin, J.*, at the 8 August 1977 Civil Session of MECKLENBURG.

On appeal by the respondent from the order of the Board of Medical Examiners of the State of North Carolina, hereinafter called the Board, revoking the respondent's license to practice medicine in North Carolina, the Superior Court reviewed the transcript of the evidence and of the proceedings before the Board. The court concluded that the Board's findings of fact are supported by susbstantial, material and competent evidence set forth in the record and that its conclusions of law are supported by the said findings of fact and are in accordance with law. The court overruled the respondent's motion to remand the matter to the Board for purposes of discovery and taking additional evidence and affirmed the Board's order revoking the respondent's license.

The record discloses that Dr. Wilkins was duly licensed to practice medicine in North Carolina and has engaged in such practice in Charlotte since 1946. In 1974, he was convicted in the Superior Court of Mecklenburg County upon the charge that he wilfully and feloniously prepared and subscribed to a false and fraudulent proof of loss, including a false and fraudulent medical bill and a false and fraudulent attending physician's report, with the intent that such documents be presented to an insurance company with reference to an automobile accident. He was sentenced to imprisonment for two years, suspended upon condition that he pay a fine of $2,000 and the costs of the action, and remain of general good behavior and not violate any criminal laws of the State of North Carolina or the United States of America.

In consequence of this conviction, following a hearing by the Board, upon due notice, the Board, on 23 October 1974, entered its order revoking the respondent's license to practice medicine in North Carolina, but suspended this order upon the condition that for a period of five years the respondent "shall not violate a State or Federal law and that for such period he remain of good behavior and conduct his practice of medicine in accordance with proper professional and ethical standards, that he keep adequate records of every patient treated or attended by him regardless of the nature of the patient's illness or condition, and that he appear before this Board at its meeting to be held in December, 1975, or

at such other times as may be requested by the Board, and that he furnish to the Board such records or other information concerning his practice of medicine that the Board may require from time to time, and furnish evidence satisfactory to the Board of his compliance with the foregoing conditions of suspension of the order as may be requested by the Board." The record does not indicate any appeal from that order.

On 31 August 1976, the respondent was duly notified by the Board that the Board had preferred against him the following charges:

"1. On November 5, 1974, you issued a written prescription to John Prillaman for Didrex, 50 mg., quantity 30, not for any legitimate medical purpose and not in the course of the legitimate practice of medicine and in violation of law.

"2. On November 12, 1974, you issued a written prescription to James Madden for Dexozyn [corrected to Desoxyn], 15 mg., quantity 30, not for any legitimate medical purpose and not in the course of the legitimate practice of medicine and in violation of law.

"3. On December 10, 1974, you issued a written prescription to John Prillaman for Didrex, 50 mg., quantity 100, and Butasol capsules, 50 mg., quantity 30, not for any legitimate medical purpose and not in the course of the legitimate practice of medicine and in violation of law.

"4. On December 10, 1974, you issued a written prescription to James Madden for Dexozyn [corrected by consent to Desoxyn], 15 mg., quantity 30, not for any legitimate medical purpose and not in the course of the legitimate practice of medicine and in violation of law.

"5. On January 3, 1975, you issued a written prescription to George Arnold for Didrex, 50 mg., quantity 30, not for any legitimate medical purpose and not in the course of the legitimate practice of medicine and in violation of law.

"6. On February 20, 1975, you issued a written prescription to John Prillaman for Didrex, 50 mg., quantity 100, and Butacaps, 50 mg., quantity 30, not for any legitimate medical purpose and not in the course of the legitimate practice of medicine and in violation of law."

On 26 October 1976, the Board duly notified the respondent that it would hold a hearing upon the above charges "for the purpose of the Board determining whether or not you have failed to comply with the terms and conditions upon which the order revoking your license to practice medicine in the State of North Carolina was suspended by this Board on the 23rd of October, 1974, and particularly whether or not you performed and engaged in the following conduct [the above six charges]."

Following the said hearing, at which the respondent appeared and testified and was represented by counsel, the Board, on 10 January, 1977, entered its order revoking the respondent's license to practice medicine in North Carolina. The order contained the separate finding of the Board as to each of the above six charges, the Board finding as to each such charge that the respondent had, on the dates specified, issued a prescription to the person specified for the drugs specified "without determining whether or not such drugs were necessary for the treatment of any ailment or disease and not for any legitimate medical purpose and not in the course of the legitimate practice of medicine." Upon these findings of fact, the Board concluded that the said conduct of the respondent "constituted a violation of the laws of North Carolina and constituted dishonorable and unprofessional conduct affecting the practice of medicine, and constituted a violation of and failure to comply with the terms and conditions upon which revocation of the license to practice medicine heretofore issued by this Board to Dr. Wilkins was suspended by this Board by order entered by the Board dated October 23, 1974."

Upon the respondent's appeal to the Superior Court, that court stayed the order of the Board "pending the outcome of the review of petitioner's appeal in the Superior Court of Mecklenburg County," and, upon the entry of the judgment of the Superior Court, again stayed the order of the Board and the judgment of the court "pending the outcome of the review of petitioner's appeal in the North Carolina Appellate Division." Thus, notwithstanding the order of the Board revoking his license and the judgment of the Superior Court affirming that order, the respondent has been permitted for 16 months to continue his practice.

Prior to the taking of evidence at the hearing before the Board on the present charges, the respondent moved that there be stricken from each of the above mentioned six charges the phrase "and in violation of law," for the reason that the respondent had previously been brought to trial on each of these charges in a criminal proceeding at which "the jury deadlocked in its decision and the charges were subsequently dismissed." The respondent further moved to dismiss the entire proceeding before the Board on the ground that he was, thereby, placed twice in jeopardy for the same acts which were the basis for the above mentioned criminal proceeding against him. The Board denied both of these motions.

The evidence at the hearing before the Board upon the present charges was, in substance, as follows:

## TESTIMONY OF JOHN PRILLAMAN

He is an undercover agent of the State Bureau of Investigation. In the course of his duty he went to the office of the respondent on 5 November 1974 and, after a short wait in the reception room, was instructed to go in to see the respondent in his inner office. The respondent was seated at his desk. The witness entered and sat down beside the desk. He had never seen the respondent before. The respondent made no examination of the body of the witness and asked him no question concerning his health or symptoms. The witness told the respondent he would like to get some Dexedrine, to which the respondent simply said, "No," without any other comment. The witness then told the respondent he wanted to get something and the respondent replied he would give the witness "either Ionamin or Didrex." The witness replied that he would rather have Didrex as he had used it before. The only reason the witness gave the respondent for desiring a prescription for Didrex was that he was a truck driver and stayed on the road "all the time" and needed something to keep him awake. The respondent then wrote the prescription for Didrex, quantity 30. The respondent asked the witness' name and the witness gave him a fictitious name and address. The witness then asked the respondent how much he owed the respondent and was told, "$8.00," which amount he paid the respondent and left the office. This was the entire consultation on this visit.

On 10 December 1974, this witness again went to the office of the respondent and, after a short wait, was told to go back to the respondent's inner office, which he did. There he sat beside the respondent at the latter's desk and told him he wanted to get another prescription for Didrex. The respondent asked his name again. The witness gave him the same fictitious name and address. The respondent then wrote the prescription for Didrex and handed it to the witness. The witness then told the respondent that he drove a truck, that he was taking Didrex which worked "real good" to keep him awake but he couldn't get to sleep, so he needed something so that he could go to sleep when he wanted to and asked the respondent to give him something for that purpose. The respondent then took the same prescription back from the witness and wrote "Butacaps," quantity 30, thereon, and returned the prescription to the witness. The witness then paid the respondent $10.00 and left the office. This was the entire consultation on this visit to the respondent's office. No one then made any examination of the body of the witness or asked him any other questions concerning his reason for wanting these medications. No nurse or any other member of the respondent's staff took the witness' temperature or blood pressure or made any other type of preparation. On each visit of this witness to the respondent's office, the respondent asked the name and address of the witness and referred to "a calendar-type thing, a big calendar."

On 20 February 1975, this witness again went to the office of the respondent, entered the reception room and gave his name and stated he wanted to see the respondent. After a short wait, he was told to go back into the respondent's inner office, which he did. He sat down and told the respondent he wanted another prescription for Didrex. Again, the respondent asked his name and was given by the witness the same fictitious name and address. The respondent immediately wrote a prescription for Didrex, quantity 100, and handed it to the witness. The witness then told the respondent he would like another prescription for the Butacaps. The respondent then wrote another prescription for Butacaps, quantity 30. The respondent asked the witness on this occasion "how they were doing," the witness responded that the Didrex were doing "real well," that he could stay awake as long as he wanted to with them and drive the truck and when he wanted to go to sleep he could take the Butacaps and get to sleep.

_In re Wilkins_

Upon receiving the two prescriptions, the witness asked the respondent how much he owed him for the visit and the prescriptions and was told $12.00, which the witness paid the respondent and left the office. This was the entire consultation on that visit.

(Each prescription given to this witness was introduced into evidence. Each bore directions as to how the drug was to be taken and each specified "No refill." The witness had the prescriptions filled and turned the substances received by him from the drug store over to Agent Holbrook of the State Bureau of Investigation. The witness did not take any of the drugs so obtained by him.)

The witness never indicated to the respondent that the witness wanted these drugs for any use other than his own personal use. At the time of his visits to the office of the respondent, the witness weighed approximately 190 pounds. He never mentioned to the respondent that he wanted the pills in order to lose weight. He was never weighed while in the respondent's office. At the time of the hearing, the witness weighed approximately 178 pounds and was five feet ten inches in height. At the time of his visits to the respondent's office, he was not under the influence of any drugs and there was nothing about his appearance to indicate he was a user of drugs. On the second visit, he did not ask for a larger quantity of Didrex than the amount specified in the first prescription. The respondent simply wrote the prescription for a larger number of pills.

### TESTIMONY OF JAMES W. MADDEN

This witness is a special agent of the Federal Drug Enforcement Administration. On 12 November 1974, acting in cooperation with the State agency, he went to the office of the respondent and asked the receptionist if he could see the respondent. She asked his name and he gave his correct name. After a short wait in the reception room, he was instructed to go in to see the doctor and went into the respondent's inner office.

The respondent was standing just inside the doorway and the witness asked, "Doc, can I get some Desoxyn?" The respondent said, "I guess so." The respondent sat at his desk and the witness took a chair beside the desk. The respondent started writing a prescription. He asked the witness his name and address, which

he put at the top of the prescription. He then handed the witness the prescription. The witness asked how much he owed the respondent and was told, "$10.00." The witness paid the respondent $10.00 and left the office. This was the entire consultation on the occasion of that visit by this witness to the office of the respondent. While in the respondent's presence, he did not remove his jacket or any of his clothing and he was in the presence of the respondent less than two minutes.

This was the first visit of this witness to the office of the respondent. On this occasion he received no physical examination from the respondent or any member of his staff. No medical history was taken. The witness gave no reason why he needed the medication and no inquiry was made by the respondent as to any such reason.

On 10 December 1974, this witness returned to the office of the respondent and, after a short wait in the reception room, went in to see the doctor. When he went into the inner office, he asked the respondent if he could get some more Desoxyn. The respondent asked how long it had been since he had been there before. The witness said, "About a month ago." The respondent glanced at the book that he had upon his desk and said, "All right." He then started writing the prescription for 30 Desoxyn. He again asked the name and address of the witness and entered ·this on top of the prescription. The witness asked him how much he owed him and the respondent said, "$10.00," which amount the witness paid the respondent and thereupon left the office with the prescription. This was the entire consultation on the occasion of the witness' second visit to the respondent's office.

The witness did not observe the respondent make any entry in any record. He did not observe any card with his name on it or any folder or anything which looked as if it might contain information concerning the witness. Neither the respondent nor any member of his staff made any examination of the witness or took any information concerning his medical history.

(The above mentioned prescriptions given to the witness Madden were introduced in evidence. Each specified, "No refill," and bore directions as to how the pills were to be used.)

The witness had these prescriptions filled and delivered the substance received to Agent Holbrook of the State Bureau of Investigation. When he went into the office of the respondent, the witness was not under the influence of any intoxicant or narcotic. He had not used any of the drugs himself and his appearance did not indicate use of drugs.

### TESTIMONY OF GEORGE ARNOLD

This witness is an agent of the State Bureau of Investigation. At the time of his visit to the office of the respondent, he was engaged in investigating diversion of pharmaceutical drugs which were "diverted to illegitimate channels and eventually ended up in street use."

On 3 January 1975, the witness visited the office of the respondent and gave a fictitious name to the receptionist, telling her that he wished to see the doctor. After a short wait in the reception room, he went back to the interior office of the respondent who was sitting at his desk. The witness told the respondent that, when the witness formerly worked in Fayetteville, there was a doctor who prescribed Preludin to keep the witness awake while he worked and asked if the respondent could help him. The respondent said, "No." The witness then said, "How about Didrex?" The respondent asked the name of the witness and was given a fictitious name and address. The respondent then wrote a prescription for 30 Didrex, 50 mgs., with directions to take one at 10:00 a.m. The witness then stood up, paid the respondent $10.00 and left the office. This was the entire consultation on this visit to the office of the respondent.

(The prescription so given to this witness was introduced in evidence, it being for Didrex with directions as to its use and specifying, "No refill.")

The respondent did not ask this witness any question about the state of his health or symptoms and made no examination of his body. The witness did not remove any part of his clothing during the visit to the office of the respondent. On this visit to that office, the witness was not under the influence of any drug, narcotic or alcohol. The story as to the obtaining of Preludin from the doctor in Fayetteville was fictitious. The witness did not tell the respondent that he wanted to convert these drugs to some il-

legal use but merely told him that he wanted to stay awake while he worked. The respondent did not encourage the witness to come back and get more pills or to tell his friends to do so. On this visit to the respondent's office, this witness was not examined and no history was taken and no questions were asked him, except as to his name and address. The respondent wrote the name "on a calendar" which was "like a log book."

## TESTIMONY OF C. D. HOLBROOK

This witness is a special agent of the North Carolina State Bureau of Investigation. Possessed with a search warrant, he searched the office of the respondent on 27 March 1975 for records pertaining to the visits to that office of each of the above witnesses. He found in the office a "Doctor's Daily Record Book" containing a page for each date of the year; the name of each individual patient was entered on a line of such page, together with the medication and the charge. There was nothing else entered on the page. The book contained pages showing the visits of Prillaman, Madden and Arnold. In each instance, the fee recorded in the book was $2.00 less than the fee which the above witnesses actually testified they paid the respondent. The respondent advised this witness that he had no other records concerning these visits.

The book did not contain any entries of diagnoses of any patients and, in only two or three instances per page, was there an entry showing a patient's blood pressure. This witness did not find in the record book any "preponderance" of entries of prescriptions. He did not find in the office what he would consider an abundance of drugs on hand. His search was limited to a search for records.

## TESTIMONY OF THE RESPONDENT

The respondent recalls the visit of the witness Prillaman to his office on 5 November 1974. He is quite certain he listened to him and made notes and that Prillaman did not ask for anything to keep him awake. He recalls prescribing for him Didrex as a weight control medicine. On the second visit Prillaman mentioned that the prescription was not controlling his appetite so he increased the dosage. He did not weigh Prillaman on any occasion. He seldom weighs his patients. He did take Prillaman's blood

*In re Wilkins*

pressure and found it normal. Since it was normal, he did not enter it on the book referred to in the testimony of the witness Holbrook.

On the visit of the witness Prillaman to the office on 20 February 1975, the respondent wrote a prescription for Butacaps because Prillaman said he was unable to sleep and the respondent considered Butacaps a mild sedative, one not used "on the street" as a "downer." The respondent uses Butacaps frequently for elderly patients and others who need a mild sedative and, in his opinion, it is an appropriate drug for that purpose. He does not use Didrex for any purpose other than weight control.

The respondent recalls that the witness Madden asked for appetite control pills and the respondent prescribed Desoxyn. The purpose of the prescription was to control his appetite. He checked Madden's blood pressure but did not weigh him or measure his height. On Madden's second visit, he requested the respondent to give him a prescription for Desoxyn. The respondent checked his book to make sure it was appropriate with reference to the amount of time between the two prescriptions. Finding out the time was approximately correct, he gave Madden another prescription for Desoxyn. He does not recall whether he took Madden's blood pressure on this second visit.

On the occasion of Arnold's visit to his office, the respondent refused to write a prescription for Preludin. Arnold said he wanted something to control his appetite, to keep his weight down, so the respondent gave him Didrex after checking his blood pressure. Since the blood pressure was normal, he did not make an entry of it in the book.

Whenever a patient comes into his office, he has an opportunity to see the patient as he comes through the door and observes his appearance. Based upon his observation and experience in 30 years of practice, he did not note any condition in these three witnesses which would indicate the likelihood of any reaction to the type of medication prescribed. Each appeared to be healthy and normal looking.

In writing prescriptions for Prillaman, Madden and Arnold, the respondent exercised his best medical judgment as to whether or not the prescriptions written by him were appropriate

for the uses for which he wrote them on those occasions. He had no notion that there was any attempt on the part of any of them to obtain drugs for any unlawful purpose.

He did not think that Didrex was a stimulant or "upper." He was a little taken aback when the witness Holbrook informed him that it was classified as such. At the time the prescriptions were written, he did not know this. He used it solely as an appetite control pill. He now knows it is an amphetamine. He is aware that the use of amphetamines as an appetite control substance is disapproved by the Medical Profession generally, but he has never had any adverse complications from such use during his practice.

Prillaman did not mention to the respondent that he needed to stay awake and, had he done so, the respondent would not have given him a prescription. He knew that Dexedrine, for which Prillaman first asked, was used as an "upper" and that is the reason he refused to give a prescription for it. He would not have prescribed Didrex to keep the patient awake. In his opinion, it is not proper medical practice for a doctor to prescribe a stimulant to enable the patient to stay awake. Such a request from the patient would be a request for "uppers."

He was, at the time of the visits of these agents, prescribing Desoxyn for some of his patients for appetite control. He knows that Desoxyn has amphetamine in it. He would not consider prescribing Desoxyn just to keep a person awake as proper medical practice. He knew, at the time of the visits of these agents, that Desoxyn was a Class II controlled substance under the laws of the United States and the laws of North Carolina.

He did not prescribe these drugs for the reasons given by the above witnesses. To prescribe these drugs for the purposes testified to by Prillaman, Madden and Arnold would not, in his opinion, constitute proper medical practice, and for him to prescribe such drugs, under the circumstances and for the purposes testified to by these witnesses, would be a violation of the Controlled Substances Law.

Prillaman appeared to him to be overweight, though he did not weigh him. Madden also appeared to be overweight. The respondent would not say that Arnold was overweight but he ap-

peared, at the time of his visit, to be "a little heavier" than at the time of the hearing. He has many patients who come in and say they want to lose a few pounds, so he gives them appetite control pills for about 30 days.

In his opinion, he has kept the records required by the previous order of the Board. He did not understand this to require a medical history of the patient.

Neither Prillaman, Madden nor Arnold requested the respondent to give him something to keep him awake. None of these asked specifically for an appetite suppressant. One of them came in and asked for something to control his weight. He does not know whether the other two specifically mentioned appetite or weight control but he does know none of these witnesses asked for something to keep him awake. Each either asked for an appetite depressant or expressed a desire to lose weight or the respondent assumed that was what he wanted. Prillaman, Madden and Arnold did not testify truthfully. In his opinion, they did not forget what had occurred on their visits to his office and, therefore, "They lied to get their point over."

He is quite certain that Agent Holbrook has had other people come into his office asking for other drugs. He knows people have been to his office through the years asking for certain things for which he would not write prescriptions for them. Had Prillaman, Madden and Arnold asked for something to keep them awake, they would not have gotten anything from him.

If the Board so desires, he has no objection to keeping a complete medical history on all of his patients.

### REBUTTAL TESTIMONY OF GEORGE ARNOLD

He is 27 years of age. His height is five feet ten inches and his weight approximately 139 polunds. At the time of his visit to the respondent's office, he weighed about 143 pounds. He has never had any problem about weight control.

### REBUTTAL TESTIMONY OF C. D. HOLBROOK

He has been connected with this type of investigation since it was started in October, 1974. The only agents known to him to have made any undercover visits to the office of the respondent were Agents Prillaman, Madden and Arnold on the occasions to

which they testified at this hearing. He is not aware of any such visits by any other people associated with other law enforcement agencies. He would not know about that. He would have no way of knowing if people not connected with the Law Enforcement Agency had visited the office of the respondent making requests for drugs.

*Smith, Anderson, Blount & Mitchell by John H. Anderson for Board of Medical Examiners of the State of North Carolina.*

*Chambers, Stein, Ferguson & Becton by James E. Ferguson II and James C. Fuller, Jr., for Respondent.*

LAKE, Justice.

By G.S. 90-1, the Medical Society of the State of North Carolina is declared to be a body politic and corporate. By G.S. 90-2, the Board of Medical Examiners of the State of North Carolina, herein called the Board, was established "in order to properly regulate the practice of medicine and surgery." The Board consists of seven regularly graduated physicians appointed by the Medical Society. G.S. 90-3. In addition to its authority and duty to examine applicants for license to practice medicine or surgery in this State, conferred upon it by G.S. 90-9, the Board is authorized by G.S. 90-14 to "revoke and rescind any license granted by it." This statute, which was rewritten in 1977, provided at the time of the matters involved in this appeal:

> "The Board shall have the power to revoke and rescind any license granted by it, when, after due notice and hearing, it shall find that any physician licensed by it *** has been guilty of any unprofessional or dishonorable conduct unworthy of, and affecting, the practice of his profession, or has been convicted in any court, State or Federal, of any felony or other criminal offense involving moral turpitude ***. The findings and actions of the Board of Medical Examiners in revoking or rescinding and refusing to issue licenses under this section, shall be subject to review upon appeal to the Superior Court, as hereinafter provided in this Article. The Board of Medical Examiners may, in its discretion, and upon such terms and conditions and for such period of time as it may prescribe, restore a license so revoked and rescinded."

G.S. 90-14.1 prescribes the notice to be given to a licensee of a hearing convened to consider the revocation or recision of his license. It is not contended that the provisions of this statute were not fully complied with in this instance. G.S. 90-14.6 provides that at such hearing the admissibility of evidence is governed by the rules applicable to civil actions. In the present instance, it is not contended that any incompetent evidence was admitted or any competent evidence rejected. The scope of judicial review of an order of the Board revoking a license is set forth in G.S. 90-14.10, which provides:

> "Upon the review of the Board's decision revoking or suspending a license, the case shall be heard by the judge without a jury, upon the record, except that in cases of alleged omissions or errors in the record, testimony thereon may be taken by the court. The court may affirm the decision of the Board or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the accused physician have been prejudiced because the findings or decisions of the Board are in violation of substantive or procedural law, or are not supported by competent, material, and substantial evidence admissible under this Article, or are arbitrary or capricious. At any time after the notice of appeal has been filed, the court *may* remand the case to the Board for the hearing of any additional evidence which is material and is not cumulative and which could not reasonably have been presented at the hearing before the Board." (Emphasis added.)

G.S. 90-14.11 provides for appeal to the Supreme Court of North Carolina under rules of procedure applicable in other civil cases.

In 1974, the respondent was convicted in the Superior Court of Mecklenburg County of a felony — the making of a false and fraudulent proof of loss, including a false medical bill and a false physician's report, for filing with an insurance company in relation to an automobile accident. No appeal was taken from that conviction and the resulting judgment thereon. G.S. 90-14, as it then read, expressly authorized the Board to revoke and rescind his license to practice medicine in this State, upon proof of such conviction, without any qualification or suspension of such revoca-

tion. The respondent does not dispute that authority in the present proceeding. Instead of doing so, the Board revoked the respondent's license but suspended such order of revocation, thus giving the respondent a second chance. One of the conditions of such suspension of that order of revocation was that, for five years, the respondent "remain of good behavior and conduct his practice of medicine in accordance with proper professional and ethical standards." No judicial review of that order of the Board was requested by the respondent. Nothing in the record indicates any request by him for clarification of its terms.

That order of the Board was entered 23 October 1974. The record of the hearing before the Board in the present proceeding contains clear evidence that, less than two weeks after that order was issued by the Board, the respondent wrote a prescription for Didrex at the request of a complete stranger, with no physical examination of him, no taking of his medical history and no questions as to any symptoms, aches or pains experienced by such person. According to the testimony of Prillaman, the stranger so requesting and receiving this prescription from the respondent, he gave the respondent no reason for desiring such prescription except that he was a truck driver and needed something to keep him awake.

Didrex is not listed by that name in the Controlled Substance Act, G.S. 90-86 et seq. That is a manufacturer's trade name. It is also known as Speed. Its chemical name is Benzphetamine Hydrochloride. This being its chemical composition, it is a Schedule II controlled substance according to the provisions of G.S. 90-90(c) which states:

"The following controlled substances are included in this schedule:

\*          \*          \*

"(c) Any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the central nervous system unless specifically exempted or listed in another schedule [which is not the case with Didrex]:

"1. Amphetamine, its salts, optical isomers, and salts of its optical isomers.

\*    \*    \*

"3. Methamphetamine, including its salts, isomers and salts of isomers."

G.S. 90-90 also provides:

"This schedule [Schedule II] includes the controlled substances listed or to be listed by whatever official name, common or usual name, chemical name, or trade name designated. In determining that a substance comes within this schedule, the North Carolina Drug Authority shall find: *a high potential for abuse*; currently accepted medical use in the United States, or currently accepted medical use with severe restrictions; and *the abuse of the substance may lead to severe psychic or physical dependence*." (Emphasis added.)

The record before us contains clear evidence that this was not an isolated, accidental oversight or mistake in judgment. The evidence, if true, as the Board obviously believed it to be, shows that within the next three and a half months the respondent, under virtually identical circumstances, gave to persons not medically examined by him, either physically or by questions, and whose medical histories and whose current conditions, symptoms or complaints were completely unknown to him, three other prescriptions for Didrex, two for Desoxyn and two for Butacaps.

Desoxyn and Butacaps are also controlled substances. "Desoxyn is a trade name used by Abbott Laboratories, North Chicago, Illinois, for Methamphetamine Hydrochloride." *State v. Newton*, 21 N.C. App., 384, 386, 204 S.E. 2d 724 (1974). It is and at the time the respondent so prescribed it was, a Schedule II controlled substance and, like Didrex, a highly dangerous drug. Butacaps, or Butasol capsules, are Butabarbital, also a controlled substance, apparently somewhat less dangerous than Didrex and Desoxyn.

Judicial review of a revocation of license by order of the Board does not authorize the reviewing court to substitute its discretion for that of the Board. G.S. 90-14.10 provides that the court "may reverse or modify the decision [of the Board] if the

substantial rights of the accused physician have been prejudiced because the findings or decisions of the Board are in violation of substantive or procedural law, or are not supported by competent, material, and substantial evidence admissible under this Article, or arbitrary or capricious."

Clearly, the findings of the Board that the respondent wrote the above mentioned prescriptions "without determining whether or not such drugs were necessary for the treatment of any ailment or disease and not for any legitimate medical purpose and not in the course of a legitimate practice of medicine," are supported by evidence in the record, although contradicted by the testimony of the respondent, himself. The findings of the Board, so supported, are conclusive upon judicial review of the Board's order. *See, In re Willis*, 288 N.C. 1, 215 S.E. 2d 771 (1975), which involved judicial review of an order of the comparable Board of Law Examiners rejecting an applicant for license, and which cited in support of this pronouncement *Konigsberg v. State Bar of California*, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed. 2d 810 (1957), and *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed. 2d 796 (1957).

[7] Upon these findings of fact, the Board concluded that the conduct of the respondent, so found, constituted a violation of the laws of North Carolina, constituted dishonorable and unprofessional conduct affecting the practice of medicine and also constituted a failure to comply with the terms and conditions upon which the Board had suspended its 1974 order revoking the respondent's license to practice medicine in North Carolina. The question now before us is whether the above mentioned findings of fact support the conclusions so drawn by the Board. In our opinion, they do.

Upon his appeal to this Court, the respondent does not deny the sufficiency of the evidence before the Board to support its said findings of fact. His contention on this appeal is that the statute under which the Board acted (G.S. 90-14) and the conditions of suspension of the 1974 order of the Board are both "vague and overbroad" and, thus, the order now before us for review, which revokes his license to practice medicine in North Carolina, violates his right to due process of law as established by the Constitution of North Carolina. Article I, § 19, and by the

Fourteenth Amendment to the Constitution of the United States. We find no merit in these contentions.

[1] The Board clearly did not deny the respondent procedural due process. He was notified in writing of the charges against him, given ample time in which to prepare his defense, was present in person and represented by able counsel, of his choice, at the hearing, was confronted by his accusers, was given ample opportunity to cross-examine them and testified in his own behalf. Procedurally, the hearing was conducted in accordance with the statute and fulfilled the requirements of the Due Process Clause of the Federal and the Law of the Land Clause of the State Constitution.

[2] Obviously, the charges brought before the Board against the respondent have no relation whatever to any of the freedoms protected by the First Amendment to the Constitution of the United States. Consequently, the "vague-overbroad" challenge to the statute and to the 1974 order of the Board is not to be weighed in this case in the delicate scales required to be used in cases where First Amendment freedoms are at stake. *United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed. 2d 228 (1975); *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed. 2d 706 (1975).

In *United States v. Powell,* supra, 423 U.S. at 93, the Court, speaking through Mr. Justice Rehnquist, said, in a case not involving First Amendment freedoms, "[S]training to inject doubt as to the meaning of words where no doubt would be felt by the normal reader is not required by the 'void for vagueness' doctrine, and we will not indulge in it." In *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed. 2d 584 (1972), in which also First Amendment rights were not involved, the Court, speaking through Mr. Justice White, said: "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. We agree with the Kentucky Court when it said: 'We believe that citizens who desire to obey the statute will have no difficulty in understanding it.'" As Mr. Justice Holmes, speaking for the Court, in *Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 57

L.Ed. 1232 (1913), said, "The law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some manner of degree."

G.S. 90-14 authorizes revocation of the license to practice medicine or surgery where the licensee "has been guilty of any unprofessional or dishonorable conduct unworthy of, and affecting, the practice of his profession." The 1974 order of the Board suspended the then revocation of the respondent's license to practice on condition that he "conduct his practice of medicine in accordance with proper professional and ethical standards."

It is reasonable to assume, as we do, that as one goes toward the outer edges of the concepts of "unprofessional," "dishonorable" or "professional and ethical standards," with reference to the practice of medicine, as in the practice of law or the other learned professions, he reaches an area in which there is room for difference of opinion among the most honorable and respected practitioners. There is, we are satisfied, no sharply defined drop off point between ethical and professional medical practice and that which is unethical and unprofessional. However, there is at and around the central core of these concepts much conduct which so clearly constitutes improper practice that few, if any, members of the profession would seriously claim to be unaware that such conduct is not consistent with these concepts.

[3] It would obviously be futile to attempt to catalog in a statute, or in an order of the Board conditionally revoking the license of a practitioner, every conceivable improper practice in which the licensee is forbidden to engage. Neither the Federal nor the State Constitution requires such a tedious exercise in futility in order to save a disciplinary statute, or order, from attack on the ground of vagueness and over-breadth. In the application of such statute or order to subsequent medical practices by a licensee, not involving his First Amendment freedoms, the facts of the case at hand must determine the decision of the courts as to vagueness and over-breadth. *United States v. Mazurie, supra.* The test is whether a reasonably intelligent member of the profession would understand that the conduct in question is forbidden.

[4] We think it obvious that any reasonably intelligent physician would know that to prescribe a highly dangerous drug for a com-

plete stranger, without making any examination of the patient or any inquiry as to his medical history or current symptoms and complaints, would be included within the phrase "unprofessional or dishonorable conduct unworthy of, and affecting, the practice of his profession," the terminology of G.S. 90-14, and would not constitute practice "in accordance with proper professional and ethical standards," the language of the Board's 1974 order. Thus, we find both the statute and the Board's order easily survive the "vague and over-broad" attack by the respondent when "examined in the light of the facts of the case at hand." *United States v. Mazurie, supra.*

In any event, in the present case, the respondent, himself, testified that, in his opinion, it is not proper medical practice to prescribe Didrex or any other stimulant just to keep the patient awake. Again, he testified that he knew Desoxyn was a Class II controlled substance and stated that, in his opinion, it would not be proper medical practice for any doctor to prescribe these drugs for the purposes "testified to by Mr. Prillaman, Mr. Madden and Mr. Arnold." His contention is that he prescribed them for a different purpose. Thus, we are brought to the simple question of whether the respondent prescribed Didrex and Desoxyn for these individuals for the purpose and under the circumstances to which the individuals each testified, or prescribed them for a different purpose and under different circumstances as the respondent testified. This is not a question of law but a question of fact upon which the Board had before it conflicting testimony. The credibility of the witnesses and the resolution of conflicts in their testimony is for the Board, not a reviewing court, and the findings of the Board supported, as these findings are, by competent evidence, are conclusive upon judicial review of the Board's order.

Furthermore, in the order under review, the Board concluded that the respondent's conduct, in the six instances found by the Board to have occurred, "constituted a violation of the laws of North Carolina." Another condition upon which the Board suspended its 1974 revocation of the respondent's license, was that "for a period of five (5) years from this date Gordon M. Wilkins, M.D. shall not violate a State or Federal law." In *State v. Best*, 292 N.C. 294, 310, 233 S.E. 2d 544 (1977), speaking through Justice Huskins, we said:

"Where a licensed physician merely writes a prescription for a controlled substance listed in Schedules II, III, IV or V, and nothing more, such act is not a violation of G.S. 90-95(a)(1). However, if that prescription is written outside the normal course of professional practice in North Carolina and not for a legitimate medical purpose, the physician violates G.S. 90-108."

In the order here under review, the Board found as a fact, in connection with the issuance of each of the six prescriptions in question, the respondent issued the prescription "not for any legitimate medical purpose and not in the course of the legitimate practice of medicine." These findings, being supported by competent evidence in the record, are conclusive on judicial review of the order of the Board.

G.S. 90-14 does not authorize the revocation of a license of a physician on the ground that he has violated a law of this State or a Federal law unless and until he has been convicted thereof. The record before us discloses that the respondent was charged in the criminal courts of Mecklenburg County with the violation of the applicable statute of this case in the writing of the said six prescriptions, but he was not convicted and the criminal charges against him were dropped when a mistrial resulted from the inability of the jury to reach a verdict.

[5] However, the 1974 order of the Board was issued in consequence of the respondent's actual conviction of a felony in the Superior Court of Mecklenburg County, so that at that time an unqualified revocation of the respondent's license was within the authority of the Board. The Board suspended its revocation of his license, at that time, on condition that he "shall not violate a State or Federal law." The respondent accepted that condition of suspension of the revocation of his license. It is clear and unequivocal. We find nothing in G.S. 90-14, or any other statute relating to the authority of the Board, which precludes the Board from suspending its order of revocation upon such condition. *Compare*, G.S. 15A-1343(b)(1) authorizing one convicted of a criminal offense to be placed on probation upon condition that he "not commit any criminal offense."

[6] A proceeding before the Board for the revocation of a physician's license on the ground that he has violated such condition of

a prior, suspended order of revocation, is a civil proceeding. Consequently, such violation of the condition of suspension of the prior order does not have to be shown beyond a reasonable doubt, but only by a preponderance of the evidence. *In re Kincheloe*, 272 N.C. 116, 157 S.E. 2d 833 (1967), *cert. den.*, 390 U.S. 1024 (1968).

[7] We, therefore, conclude that the findings of fact made by the Board are fully supported by competent evidence in the record, these findings support the conclusions of law reached by the Board and those conclusions support the order of the Board revoking the license of the respondent to practice medicine in North Carolina. The revocation of the license is authorized by and is in accord with both G.S. 90-14 and the conditions of the 1974 order of the Board.

[8] There remains for consideration only the contention of the respondent that the Superior Court erred in its denial of his motion, filed before the hearing in the Superior Court, that the matter be remanded to the Board for further proceedings. The alleged ground of the motion is that he has been denied by the Board the equal protection of the laws in that the order of the Board was based "wholly or in part upon the petitioner's [respondent's] race and color."

The motion for remand states, "It is the petitioner's position that white doctors, similarly situated and upon similar conduct and behavior have not been treated as severely as petitioner and that this disparate treatment constitutes racially discriminatory action by the Board in violation of petitioner's constitutional rights." The motion requested the court to remand the matter to the Board and allow him 180 days "discovery time so that petitioner can take the depositions of the current and past members of the Board of Medical Examiners, inspect prior records of the Board of Medical Examiners involving other cases, and promulgate to the Board interrogatories designed to determine whether the action taken against petitioner had a racial intent and/or impact."

The record discloses not one shred of evidence of such discrimination or that the race of the respondent had any bearing whatever upon the order of the Board. The respondent was notified in writing of the charges against him on 31 August 1976. He filed his answer thereto on 29 September 1976, simply deny-

ing each allegation. On 26 October 1976, he was given notice that the matter would be heard by the Board and the hearing was had on 8 December 1976. Nothing whatever in the record indicates that in the intervening three months the respondent requested permission to examine, or made any effort to examine or make any inquiry into, actions of the Board in cases involving other physicians. No evidence of any action of the Board indicating bias against or antipathy toward physicians of the respondent's race was presented or even suggested to the Superior Court in support of this motion. From the time of the respondent's notice of appeal to the Superior Court to the filing of his brief in this Court 13 months elapsed. In that time, the respondent has apparently discovered nothing whatever to justify his accusation against the Board. In his brief in this Court, he says:

"After the hearing [before the Board], however, Dr. Wilkins became aware of matters, not of record, that caused him to question the objectivity with which his case was reviewed by the Board. Specifically, Dr. Wilkins received statements, became aware of rumors and read media coverage of other situations—all of which suggested that black doctors in general and Dr. Wilkins in particular were being subjected to higher standards of review by the Board and were subjected to consistently more severe punishment at the hands of the Board than were white doctors similarly situated.

"As such rumors persisted in the spring and summer of 1966 [presumably 1976], Dr. Wilkins, through counsel, sought to develop a record necessary to bring these issues before the court for determination on the merits. N.C. General Statutes Sec. 90-14.8 to 14.10 does not provide for discovery as is contemplated in the Rules of Civil Procedure. However, in Section 14.10, the opportunity is presented to a respondent to petition the Superior Court for remand to allow development of the record regarding matters not previously covered in the proceedings below. This, Dr. Wilkins sought to do by motion filed on 5 July 1977."

The Superior Court was not required to remand this matter to the Board for further proceedings in the absence of some preliminary showing by the respondent of basis for his accusation

of racial discrimination and prejudice against the respondent. Now, eight months after the denial of the motion in the Superior Court and 15 months after the issuance of the order of the Board, the respondent brings to our attention no basis for his allegation except unspecified "statements," "rumors" and "media coverage" with no indication as to the source or credibility of such alleged bases for his accusation.

The respondent's accusation against the Board and his exception to the denial of his motion by the Superior Court do not merit detailed discussion. His counsel appears to proceed upon the theory that the mere facts that the respondent in a revocation of license proceeding, or a defendant in a criminal action, is a member of the Negro race and has been found guilty of the alleged misconduct is sufficient to make out a prima facie case that the administrative body or the jury which ruled against him was racially biased. Such a contention is patently absurd.

In the present instance, moreover, we are not limited to the obvious insufficiency of the respondent's argument in support of his contention. The record discloses that the Board in 1974 had ample basis for an unqualified, instantly effective, revocation of the respondent's license for his conviction of a felony in connection with the practice of medicine. With no obligation whatever to do so, the Board gave him a second chance. He has simply failed to measure up to the reasonable conditions imposed upon that opportunity by the Board.

Notwithstanding the findings and order of the Board in the present matter, its order of revocation has been stayed pending judicial review, first in the Superior Court and now in this Court. Thus, the respondent has been allowed to continue the practice of medicine for more than 15 months after the order of the Board revoking his license to do so was entered. The order of the Board in the 1974 proceeding, the record of the hearing before the Board in this proceeding, and the treatment of the respondent since that order was entered, clearly belie his charge that the revocation of his license to practice medicine in this State is due to prejudice against members of his race.

Affirmed.