WHITE v. N.C. BD. OF EXAMINERS OF PRACTICING PSYCHOLOGISTS

[97 N.C. App. 144 (1990)]

THOMAS K. WHITE v. THE NORTH CAROLINA STATE BOARD OF EXAMINERS
OF PRACTICING PSYCHOLOGISTS

No. 8810SC1137

(Filed 6 February 1990)

1. **Physicians, Surgeons, and Allied Professions § 6 (NCI3d) — psychologist's code of ethics — test for constitutionality**

 The test for determining the constitutionality of a professional code of ethics, such as the Ethical Principles of Psychologists, is whether a reasonably intelligent member of the profession would understand that the conduct in question is forbidden; the facts of the case at hand determine the decision of the courts as to vagueness and overbreadth. N.C.G.S. § 90-270.15.

 **Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 28-30, 132.**

2. **Physicians, Surgeons, and Allied Professions § 6 (NCI3d) — psychologists — Preambles to Ethical Principles — unconstitutionally vague**

 The Preambles to the Ethical Principles of Psychologists are unconstitutionally vague under the North Carolina and the United States Constitutions and a psychologist should not have been sanctioned for violation of the preambles. U. S. Constitution Amendments V and XIV; North Carolina Constitution Art. I, § 19.

 **Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 28-30, 132.**

3. **Physicians, Surgeons, and Allied Professions § 6 (NCI3d) — psychologists — Ethical Principles of Psychologists — not unconstitutionally vague**

 The Ethical Principles of Psychologists are not unconstitutionally vague, a reasonably intelligent psychologist would understand that the conduct in question is forbidden, and a psychologist may be sanctioned for violations of those principles.

 **Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 28-30, 132.**

4. **Physicians, Surgeons, and Allied Professions § 6.2 (NCI3d) — psychologist — violations of ethical principles — revocation of license**

The Board did not have sufficient evidence under the whole record test to find and conclude that a psychologist had violated Ethical Principle 5c, dealing with confidentiality, in that the psychologist had lost diagnostic testing materials and results. While the psychologist's behavior might evidence certain professional failures, there was no showing that the psychologist's filing system violated a client's right to confidentiality under Principle 5c. It was uncontested that the file was lost, but there was no evidence that anyone had access to the information.

Am Jur 2d, Divorce and Separation §§ 984, 985; Physicians, Surgeons, and Other Healers §§ 82, 92, 99.

5. **Physicians, Surgeons, and Allied Professions § 6.2 (NCI3d) — psychologist — violation of ethical principles — misuse of influence — (violating or diminishing legal and civil rights of others) — no violation**

There was sufficient evidence to support the finding of the Board that petitioner psychologist violated Ethical Principle 3c, which requires that psychologists avoid any action that will violate or diminish legal and civil rights of clients and others, where petitioner violated a custodial mother's civil rights by examining her child without the mother's consent. Principle 3c does not intend nor state that a psychologist cannot testify in a custody dispute, but petitioner should have notified the custodial parent that he was providing treatment. There was insufficient evidence of a violation of Principle 1f, which requires psychologists to be alert to situations and pressures which might lead to misuse of their influence, where the Board's finding of fact stated that petitioner's testimony about which parent had custody was not credible.

Am Jur 2d, Divorce and Separation §§ 984, 985; Physicians, Surgeons, and Other Healers §§ 82, 92, 99.

6. **Physicians, Surgeons, and Allied Professions § 6.2 (NCI3d) — psychologist — violations of ethical principles — actions affecting civil or legal rights — misuse of influence**

Although there was sufficient evidence to support the Board's findings of fact, the findings did not support the Board's

conclusion that petitioner psychologist had violated Ethical Principle 3c, which requires psychologists to avoid any action that would violate or diminish legal or civil rights of others, where the court concluded that petitioner's opinion in a case summary was not supported by evidence in the record. The Board also improperly concluded that petitioner violated Principle 1f, which reminds psychologists not to submit to pressures which might lead to misuse of their influence, where the Board presented no evidence that petitioner in fact misused his influence by giving his professional opinion.

Am Jur 2d, Divorce and Separation §§ 984, 985; Physicians, Surgeons, and Other Healers §§ 82, 92, 99.

7. **Physicians, Surgeons, and Allied Professions § 6.2 (NCI3d) — psychologist — violation of ethical principles — maintaining adequate records — understanding of testing and test results**

The Board improperly concluded that petitioner psychologist violated Ethical Principle 3c by failing to maintain adequate and consistent records where a noncustodial father paid more than he owed because of an incorrect statement from petitioner. Although petitioner's billing records are incomplete and somewhat haphazard, the error in billing which totaled $80.00 does not constitute a violation of the father's legal and civil rights, particularly since a refund was paid. There was sufficient evidence to support the conclusion that petitioner violated Ethical Principle 2e in diagnosing the child with dyslexia where there was unrebutted substantial evidence that the diagnosis could not have been ethically done in a child of that age.

Am Jur 2d, Divorce and Separation §§ 984, 985; Physicians, Surgeons, and Other Healers §§ 82, 92, 99.

8. **Physicians, Surgeons, and Allied Professions § 6.2 (NCI3d) — psychologist — violation of ethical principles — misuse of influence — adherence to laws and regulations — cooperation with other professional groups**

There was insufficient evidence to support the Board's conclusion that petitioner psychologist violated Ethical Principle 1f, dealing with misuse of influence, in diagnosing sexual abuse in two children and in treating their mother; there was insufficient evidence of a violation of Ethical Principle 3c, which

requires avoidance of any action which will violate or diminish legal and civil rights of clients, where petitioner's actions may have been inappropriate but did not violate the principle; there was sufficient evidence to support a violation of N.C.G.S. § 7A-543 and Ethical Principle 3d by failing to report suspicion of child abuse to the proper governmental agency even though petitioner contended that he thought the matter was already in the judicial system; and there was insufficient evidence of a violation of Ethical Principle 7b, requiring cooperation with other professional groups, where petitioner did not offer his services in substitution of the mother's therapist, but recommended that the patient seek help from another practitioner with a different philosophy.

Am Jur 2d, Divorce and Separation §§ 984, 985; Physicians, Surgeons, and Other Healers §§ 82, 92, 99.

9. Physicians, Surgeons, and Allied Professions § 6.2 (NCI3d) — psychologist — violation of ethical principles — child custody and visitation dispute

There was insufficient evidence for the Board to conclude that petitioner's actions in a child custody and visitation dispute violated Ethical Principles 1f and 3c, where petitioner's testimony indicated that he made conclusions about visitation based solely on the patient's natural mother's statements that the stepmother was unstable. There is nothing in the evidence to indicate that petitioner was under any obligation under the Principles to conduct further investigation before making his recommendations and, although petitioner's recommendation may have had an effect on civil and legal rights, there was no evidence that he was under a professional obligation to collect additional information before he made his recommendations. However, there was substantial evidence in the record to support the findings of a violation of Principle 7b, which requires cooperation with other professional groups, and petitioner did not except to those findings or conclusions in the record on appeal and did not argue this issue in his brief.

Am Jur 2d, Divorce and Separation §§ 984, 985; Physicians, Surgeons, and Other Healers §§ 82, 92, 99.

**10. Physicians, Surgeons, and Allied Professions § 6.2 (NCI3d)—
   psychologist—violation of ethical principles—use of inappro-
   priate test**

  There was sufficient evidence to support the Board's con-
clusions that petitioner violated Ethical Principle 8d in the
use of an outdated intelligence test, but insufficient evidence
to support a violation of Principle 8c, regarding misuse of
tests and interpretations by others, where petitioner contend-
ed that he would not release such a report without a cover
letter explaining the report.

  **Am Jur 2d, Divorce and Separation §§ 984, 985; Physi-
cians, Surgeons, and Other Healers §§ 82, 92, 99.**

APPEAL by petitioner from *Stephens (Donald W.), Judge.* Judg-
ment entered 11 May 1988 in Superior Court, WAKE County. Heard
in the Court of Appeals 11 April 1989.

On 22 December 1983, the North Carolina State Board of Ex-
aminers of Practicing Psychologists (the Board) sent a letter to
petitioner, Dr. Thomas K. White, stating that information had been
obtained regarding Dr. White's professional conduct which, if true,
would constitute grounds to revoke or suspend his license to prac-
tice psychology. In a letter dated 27 December 1983, petitioner
requested the Board to grant him a formal evidentiary hearing
before the full Board.

On 22 June 1984, the Board filed an action in Superior Court
of Wake County against petitioner. After a hearing, the court ordered
that the Assistant Attorney General (who regularly represented
the Board) could prosecute the Board's case against Dr. White.
Further, the court ordered that there be no *ex parte* communication
regarding this matter between the Assistant Attorney General
and the Board.

The administrative hearing was held on 20 and 21 February
1986. The Board entered its decision to permanently revoke peti-
tioner's license to practice psychology on 24 July 1986. Respondent
found that petitioner committed various violations of the "Ethical
Principles of Psychologists" (hereinafter the Principles) and main-
tained the authority to revoke a license or take disciplinary action
pursuant to these Principles and G.S. 90-270.15. The specific find-
ings and conclusions will be addressed later in the opinion. General-
ly, respondent made the following findings, among others, with

regard to petitioner's (hereinafter Dr. White) professional conduct in evaluating various patients between 1979 and 1982: (1) Dr. White failed to adequately safeguard test materials and records by misplacing a patient file; (2) Dr. White overcharged a parent for services rendered on his child and failed to inform clients of billing charges or adequately maintain accurate billing records; (3) Dr. White's notes and tests failed to coincide with summary evaluations made concerning particular patients; (4) Dr. White opposed a second opinion as commonly used in accordance with the customary standard of practice of psychology; (5) Dr. White used an outdated version of an intelligence test to gauge a child's activity; and (6) Dr. White failed to notify a custodial parent that White was providing psychological services to the child.

On 29 September 1986, Dr. White filed a petition in the Superior Court of Wake County pursuant to the North Carolina Administrative Procedure Act (formerly G.S. 150A, now 150B). Dr. White requested a reversal of respondent's decision and a stay of the action revoking his license pending further review. According to the "Statement of Stay of Execution," the Superior Court granted a stay and preliminary injunction on 8 October 1986 pending the outcome of the trial in the Superior Court.

On 11 May 1988, the Superior Court entered its judgment upholding the respondent's administrative decision and withdrew the previously entered stay of execution. A stay was again granted on 14 July 1988 pending a decision by this Court. From the order affirming the respondent's decision to revoke his license, petitioner appeals.

*DeBank, McDaniel, Heidgerd, Holbrook & Anderson, by C. D. Heidgerd, for petitioner-appellant.*

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Norma S. Harrell, for respondent-appellee.*

ORR, Judge.

I.

[1] We shall first address whether, as Dr. White maintains, the Ethical Principles of Psychologists are vague and unconstitutional under the North Carolina and United States Constitutions.

Under G.S. 90-270.15, the Board may refuse, revoke, suspend or limit under subsection (e) a license upon proof of one of the ten criteria under subsection (a). Under (a)(8), the Board revoked Dr. White's license based upon his alleged guilt "of unprofessional conduct as defined by the then-current code of ethics . . . ." Such code is the Ethical Principles of Psychologists.

In determining the constitutionality of such code of ethics, "[t]he test is whether a reasonably intelligent member of the profession would understand that the conduct in question is forbidden." *In re Wilkins*, 294 N.C. 528, 548, 242 S.E.2d 829, 841 (1978) (*abrogated on unrelated issue* by *In re Guess*, 324 N.C. 105, 376 S.E.2d 8 (1989)); *see also In re Hawkins*, 17 N.C. App. 378, 194 S.E.2d 540, *cert. denied*, 283 N.C. 393, 196 S.E.2d 275, *cert. denied*, 414 U.S. 1001, 38 L.Ed.2d 237, 94 S.Ct. 355 (1973). We agree with Justice Lake's reasoning in *Wilkins* that:

> It is reasonable to assume . . . that as one goes toward the outer edges of the concepts of 'unprofessional,' 'dishonorable,' or 'professional and ethical standards,' with reference to the practice of medicine, as in the practice of law or the other learned professions, he reaches an area in which there is no room for difference of opinion among the most honorable and respected practitioners. There is, we are satisfied, no sharply defined drop off point between ethical and professional . . . practice and that which is unethical and unprofessional. However, there is at and around the central core of these concepts much conduct which so clearly constitutes improper practice that few, if any, members of the profession would seriously claim to be unaware that such conduct is not consistent with these concepts.

*Id.* at 548, 242 S.E.2d at 840.

In setting forth the above test, Justice Lake noted that it would be "futile to attempt to catalog in a statute, or in an order of the Board . . . , every conceivable improper practice in which the licensee is forbidden to engage." *Id.* at 548, 242 S.E.2d at 840-41. Furthermore, the State and Federal Constitutions do not require such for a statute or regulation to survive an attack on grounds of vagueness and overbreadth. *Id.* For these reasons, "the facts of the case at hand must determine the decision of the courts as to vagueness and overbreadth." *Id.* (citation omitted).

[2]   The Board concluded that Dr. White violated the Preamble to the Ethical Principles and Preamble to Principles 1, 2, 6, 7, and 8, and committed specific violations of Principles 1f, 2e, 3c, 3d, 5c, 7b, 8c, and 8d. Dr. White was charged with a total of 34 violations, any one of which potentially subjected his license to revocation under G.S. 90-270.15.

We conclude, however, that all of the above mentioned Preambles fail the test under *Wilkins*. Looking at the Preambles and the facts surrounding the alleged violations, a reasonably intelligent member of the profession would not understand that the conduct in question is forbidden.

For example, the Preamble to the Ethical Principles requires "respect" for the patients, "knowledge of human behavior," "objectives," "accept[ing] responsibility," and "competence, objectivity in the application of skills." The Preambles to Principles 1 and 2 discuss maintaining the "highest standards of [the] profession," accepting "responsibility for the consequences of their acts," using "techniques for which they are qualified," "take whatever precautions are necessary to protect the welfare of their clients." The Preambles to Principles 6, 7, and 8 are equally vague.

The above Preambles do not contain any specific behavior which is prohibited. They do not put a "reasonably intelligent member of the profession" on notice that any particular conduct is forbidden, and therefore fail the test under *Wilkins*.

Moreover, we believe that it would be difficult to sanction Dr. White for a violation of the Preambles. First, as we stated above, there is no specific behavior prohibited by the Preambles. They are only statements of vague general concepts of behavior.

Second, a preamble, by its very definition, is not a rule or regulation which lends itself to violation. A preamble is defined as an "*introduction*," such as that to a "statute, ordinance, or regulation that states the reasons and intent of the law or regulation or is used for other explanatory purposes . . . ." Webster's Third New International Dictionary (1968).

Each of the above Preambles contains only precatory language to explain what general professional behavior each Principle covers. Each *Principle* then sets forth what a reasonably intelligent member of the profession may or may not do to meet the requirements of the Principle.

Therefore, for purposes of being cited for specific violations, we hold that the above Preambles are unconstitutionally vague under the North Carolina and United States Constitutions. U.S. Const. amend. V and XIV; N.C. Const. art. I, sec. 19; *see generally In re Moore*, 289 N.C. 95, 221 S.E.2d 307 (1975) (statute must be held void only if it is so loosely and obscurely drawn as to be incapable of enforcement). Moreover, the Preambles fail the test set forth in *Wilkins* because a reasonably intelligent psychologist "would [not] understand the conduct in question is forbidden." Because we hold that the Preambles are unconstitutional for these purposes, we will not address them further as specific charges against Dr. White.

[3] Therefore, we hold that Dr. White may be sanctioned only for violations of the specific Principles 1f, 2e, 3c, 3d, 5c, 7b, 8c, and 8d, and we shall limit our subsequent discussion to their constitutionality. In applying the test of *Wilkins* to the Principles before us, we hold that they are not unconstitutionally vague, and that a reasonably intelligent psychologist would understand that the conduct in question is forbidden.

Principle 1 is entitled "Responsibility." Specifically, Principle 1f directs psychologists to be "alert to personal, social, . . . financial or political situations and pressures that might lead to misuse of their influence." This Principle alerts psychologists concerning misuse of their influence in certain situations. Because Dr. White was specifically charged with allowing his influence to be misused in several situations pursuant to this Principle, we find that it meets the *Wilkins* test.

Principle 2 is entitled "Competence." Principle 2e specifies that if a psychologist is involved in testing individuals and decisions affecting individuals, that psychologist must understand the testing methods and research. We find this Principle to be very clear as applied to Dr. White's alleged violations in his methods of testing and use of outdated tests. A reasonably intelligent psychologist would understand from reading this Principle that actions allegedly committed by Dr. White are forbidden.

Principle 3 is entitled "Moral and Legal Standards." Dr. White allegedly violated Principles 3c and 3d.

Principle 3c states that a psychologist shall avoid any action violating or diminishing "the legal and civil rights of

clients . . . ." Almost any action involving custody and visitation affects someone's civil and legal rights. This Principle, however, specifically notifies a psychologist that in any matter involving a client's civil and legal rights, he should proceed cautiously and do everything possible to prevent violating these rights. We believe this Principle meets the requirements set forth in *Wilkins*.

Principle 3d states that psychologists obey relevant laws and regulations. This Principle is clear. Dr. White allegedly violated G.S. 7A-543, and in violating a statute, he would also violate Principle 3d.

Principle 8d states that psychologists "make every effort to avoid and prevent the misuse of obsolete measures." This Principle notifies a psychologist not to use an obsolete test. Dr. White allegedly used obsolete psychological tests. We find that Principle 8d is not vague, and that a professional psychologist would be aware of testing methods considered obsolete by the majority of other psychologists.

Based upon our analysis, we therefore conclude that the above Principles are constitutional under the North Carolina and United States Constitutions, and meet the test set forth in *Wilkins*.

## II.

[4] Dr. White further contends the Board's findings of fact and conclusions of law were not supported by substantial evidence in view of the entire record as submitted.

The standard of review under the Administrative Procedure Act is found in G.S. 150A-51 (now 150B-51), which governs those cases commenced before January 1, 1986. Although the case before us was not heard by the Board until February 1986, Dr. White was notified of the allegations on 22 December 1983, and he requested a hearing on 27 December 1983.

Under G.S. 150A-51, the court must consider whether the administrative decision is supported by substantial evidence based upon the entire record as submitted. This is commonly known as the "whole record" test, which requires the reviewing court to consider all of the evidence, including that which supports the findings and that which is contradictory. *Thompson v. Board of Education*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977) (citations omitted). The court is not allowed to replace the agency's judgment when there are two reasonably conflicting views, although the

court could have reached a different decision had the matter been before it *de novo. Id.* Moreover, the credibility of the witnesses and the resolution of conflicting testimony is a matter for the administrative agency to resolve, not the reviewing court. *State ex rel. Comr. of Insurance v. Rate Bureau,* 300 N.C. 381, 406, 269 S.E.2d 547, 565, *reh'g denied,* 301 N.C. 107, 273 S.E.2d 300-01 (1980).

With these Principles in mind, we now turn to whether there was substantial evidence to support the findings of fact and conclusions of law. Substantial evidence has been defined as more than a scintilla or a permissible inference; it is relevant evidence which is adequate to support a conclusion. *Lackey v. Dept. of Human Resources,* 306 N.C. 231, 238, 293 S.E.2d 171, 176 (1982) (citations omitted).

### A.

The first incident before the Board involves Dr. White's administration of diagnostic tests to a minor (Beth) who was his patient on or about 3 December 1980. In this matter, the Board concluded that Dr. White violated Principle 5c. Principle 5c requires psychologists to "make provisions for maintaining confidentiality in the storage and disposal of records."

The evidence also indicates that Dr. White saw Beth a total of four times in late December of 1980 and early January of 1981. During one of these appointments, Dr. White conducted psychological testing and evaluation. Sometime after his January 1981 appointment with Beth, Dr. White referred her to David Wiley, a counselor in his office. Wiley saw the patient for several months, and during that time Wiley kept records of his meetings with the patient. Wiley testified that he never had in his possession the testing materials and results that Dr. White had conducted concerning Beth.

In December 1981, Beth's parents consulted Dr. Mary Kilburn. Dr. Kilburn wrote Dr. White on 16 December 1981 requesting his records of the results of the diagnostic tests he administered to Beth the previous year. Dr. Kilburn made repeated requests for Dr. White's file on Beth because the results of the testing were necessary to make treatment plans for Beth, including the possibility of hospitalization. Dr. Kilburn subsequently notified the Ethics Committee of the American Psychological Association of Dr. White's failure to satisfy her requests. Dr. Kilburn testified that she

finally reached Dr. White's wife on 3 February 1982, who assured Kilburn that Beth's file was on White's desk. On 10 February 1982, Dr. Kilburn finally reached Dr. White who confirmed that he was unable to find Beth's records.

Dr. White testified that he was unable to find the file or material which he believes was misplaced when he was operating out of two offices or was mislabeled and thrown out during his move in February 1982. In November 1982, Dr. White contacted Wiley to see if he had Beth's file. In late December 1982, Wiley forwarded Beth's file, but it did not contain Dr. White's original notes. Dr. White, however, contacted the A.P.A. Ethics Committee and told them the missing file had been located. When Dr. Kilburn received the file, the diagnostic test results she wanted were not included.

The Board found as fact and concluded that:

In losing all diagnostic testing materials and results and all materials on file as to Respondent's seeing Beth [ ] professionally, and in failing to appropriately respond to Dr. Kilburn's repeated requests for the test materials or conclusions, or in failing to provide Dr. Kilburn at least some statement as to what he remembered as a result of this testing . . . Respondent has further violated principle 5c, in failing to make provisions for maintaining confidentiality in the storage and disposal of records; . . . .

While Dr. White's behavior in this matter might evidence certain professional failures, there is no showing in the case *sub judice* that Dr. White's filing system violated a client's right to confidentiality under Principle 5c. It was uncontested that the file was lost, but there was no evidence that anyone had access to the information.

We therefore conclude that the Board did not have sufficient evidence to support their findings of fact and conclusions of law that Dr. White violated Principle 5c.

B.

[5]  Dr. White had a patient named Shannon, whom he saw several times between July 1979 and summer of 1980. In October 1979, Shannon's parents signed a separation agreement which gave Shannon's mother custody and her father visitation rights. Dr.

White only saw Shannon on Fridays and Saturdays at the request of her father when she was visiting her father. Gregory Stott, Shannon's mother's attorney in the custody matter, testified that Shannon's parents separated in March 1979, and Shannon lived with her mother when the separation occurred. There was substantial evidence before the Board that Dr. White was, in fact, aware that Shannon's mother had custody of her during a majority of the time he was seeing Shannon.

The Board found the doctor's actions violated Principle 3c and Principle 1f as follows:

> In seeing Shannon [ ] repeatedly while she was in the custody of her mother, during visitations on weekends with her father, without involving Shannon's mother in the therapy process or obtaining her consent to the therapy process or informing her of the therapy or sessions with Shannon, Respondent acted in violation of Principle 3c of the Ethical Principles of Psychologists which requires psychologists '[i]n their professional roles' to 'avoid any action that will violate or diminish the legal and civil rights of clients and of others who may be affected by their actions.' Respondent's repeated sessions with Shannon [ ] during visits to her father, while she was in the legal and physical custody of her mother, and his preparation or development of a basis during those visits for testimony to support the father's motion for custody, was inconsistent with and in violation of the obligation that he avoid an action that would violate or diminish the legal or civil rights of Shannon['s] [ ] mother, a person who clearly could be affected by his actions. In this regard, Respondent also violated Principle 1f, which requires psychologists to know 'that they bear a heavy social responsibility because their recommendations and professional actions may alter the lives of others' and to be 'alert to personal, social, financial or political situations and pressures that might lead to misuse of their influence.' Each of these violations of the Ethical Principles of Psychologists is grounds for revocation or suspension of Respondent's license to practice psychology under G.S. [sec.] 90-270.15(a).

(Exception omitted.)

This conclusion of law was based upon findings of fact numbers 15, 16, 17, and 18, to which Dr. White did not except. After

reviewing the findings, we hold that there are sufficient findings of fact upon which to base the above conclusions. We now turn to whether the evidence supports these findings.

Principle 3c reads:

> In their professional roles, psychologists avoid any action that will violate or diminish the legal and civil rights of clients or of others who may be affected by their actions.

The Board claims that Dr. White violated Shannon's mother's civil rights by examining Shannon without the mother's consent. Principle 3c does not intend nor does it state that a psychologist cannot testify in a custody dispute since one parent's civil rights are always affected. However, pursuant to Principle 3c, Dr. White should have notified the custodial parent that he was providing treatment to Shannon.

Dr. Robert Grew, child psychologist, testified as follows as an expert for the Board regarding the practice of notifying both the custodial and noncustodial parents of a child that the child is receiving psychological treatment.

> Q   Do you have an opinion as to the standard of practice in seeing a child—the standard of practice in North Carolina in early 1981 or the end of 1980—in seeing a child brought in by a noncustodial parent?
>
> A   Yes.
>
> . . .
>
> Q   What is the standard of practice in dealing with children in a custody situation with regard to custodial and noncustodial parents?
>
> A   I think there has been a lot of literature and research in this area, both clinical and empirical. I think *what is recommended and has been recommended for some time, that when one is working in a two-family situation, that not only must one obtain permission from the custodial parent to see the child, but one must obtain permission from the custodial parent to involve the noncustodial parent*; [emphasis added] and that if permission is not obtained, I personally will not work in that kind of situation. I don't think that is for the benefit of the child, nor does it fall under taking special care of the child. It is not a way for me to helpful [sic] to the child.

Dr. Grew further testified that unless all parties in a two-family situation are informed concerning psychological treatment of a child, then the treatment itself is unlikely to be effective. Therefore, the evidence supports the finding that Dr. White violated Principle 3c.

The Board also concluded that Dr. White violated Principle 1f in treating Shannon. Principle 1f reads:

> As practitioners, psychologists know that they bear a heavy social responsibility because their recommendations and professional actions may alter the lives of others. They are alert to personal, social, organizational, financial, or political situations and pressures that might lead to misuse of their influence.

The Board's finding of fact concerning Shannon states that Dr. White's testimony about which parent had custody of Shannon was "simply not credible." Dr. White's actions are not in violation of Principle 1f, whether or not he lied about which parent had custody. With regard to Shannon, we find that Dr. White violated only Principle 3c.

## C.

[6] Dr. White was also charged with violating Principles 3c and 1f in his treatment of the "M" family. In early December 1981, Dr. White and his associate, Ms. Edwards, began seeing the "M" family which consisted of both parents and two children. The couple had already been to court, and they needed to settle custody and visitation issues. In November 1981, the court issued a restraining order to keep Mr. "M" from harassing his wife.

Dr. White's notes taken during sessions with the members of the "M" family indicated the children were afraid of their father. White sent the attorneys for both parties a letter dated 1 February 1982 stating the children should be in the custody of their mother and the father's visitation should be extremely limited.

Dr. White and Ms. Edwards indicated in their case notes that in December 1981, January, February and March 1982, Mr. "M" showed aggressive, threatening behavior toward Mrs. "M" and the children, and that Mrs. "M" and the children were afraid for their lives.

On 10 March, 19 March, 26 March and 2 April 1982, case notes from sessions with Mr. "M" indicate that he threatened

to take the children to another state, that he was "defensive, very unpredictable and erratic now," that he had been following Mrs. "M" around (in violation of the prior court order), and that he would continue to harass Mrs. "M" until "she breaks and begs him to quit." There are no other case notes concerning sessions or contacts with Mr. or Mrs. "M" between 2 April 1982 and 15 April 1982.

On 15 April 1982, White and Edwards filed a case summary. The case summary favored the father regaining some rights which had been taken away from him. For example, the case summary concluded:

> that Mr. and Mrs. M[ ] have not followed the recommendations of counseling in that Mr. M[ ] has continued to take actions as reported to us that harass and provoke Mrs. M[ ] (example: following her in his truck), and in that Mrs. M[ ] has withheld visitation to Mr. M[ ] and continues to try to make Mr. M[ ] appear a dangerous person to the children which is contrary to his family history and present psychological status. Mr. M[ ] feels that he has a need and a right to see his children, and that he is going to continue his behavioral operations until his needs and rights are respected. Mrs. M[ ] feels that Mr. M[ ] is going to harm her, that he is going to take the children, and that he is deliberately and intentionally harassing her. The counselors see this behavior of both parties as very adolescent and immature. Both parties agree that they should not conduct these operations, but seem unable to cease and desist at this time. The situation with Mrs. M[ ] has been greatly accentuated by what are apparently outside suggestions that (1) she move in with her mother (Melaine does not relate well to her maternal grandmother and this is disruptive to the children); (2) that she travel with a bodyguard; (3) that she keep a gun by the door (the discussion, contemplation and effecting of these actions are extremely anxiety provoking to the children).

White and Edwards then recommended that the court assume custody of the "M" children and consider foster care placement, that the court restore full visitation rights to Mr. "M," and that the court require Mr. and Mrs. "M" to strictly adhere to guidelines regarding visitation, harassment and negative statements about each other.

The Board concluded Dr. White violated Principles 3c and 1f as follows:

> 6. In signing and submitting the April 15, 1982, case summary regarding the M[ ] family, Respondent violated . . . Principle 3c in failing to avoid an action that would violate or diminish the legal or civil rights of Pat M[ ]; and Principle 1f requiring psychologists to know 'that they bear a heavy social responsibility because their recommendations and professional actions may alter the lives of others' and to be 'alert to personal, social, . . . financial, or political situations and pressures that might lead to misuse of their influence,' which violations are grounds for revocation or suspension of Respondent's license to practice psychology under G.S. [sec.] 90-270.15(a).

This conclusion is based upon findings of fact numbers 19 through 27. The conclusion of law, however, does nothing but repeat the Principle and does not tie the findings of fact to the conclusion of law. Although there is substantial evidence to support the findings of fact, those findings do not support the above conclusion of law.

We find that Dr. White cannot be sanctioned for violating Principle 3c in this case solely because his opinion in the case summary was not supported by the evidence in the record. Principle 3c, quoted earlier in this case, deals with a psychologist avoiding a situation which would violate or diminish anyone's civil or legal rights. It simply does not follow that when a psychologist forms an opinion apparently not supported by his 'earlier case notes, and makes recommendations based upon that opinion, then the psychologist violates Principle 3c.

The Board also concluded that Dr. White violated Principle 1f when he signed and submitted the Case Summary. This Principle (quoted above) reminds psychologists not to submit to "pressures that might lead to misuse of their influence." The Board presented no evidence that Dr. White in fact misused his influence by giving his professional opinion in the "M" family Case Summary. Therefore, with regard to the "M" family, we find that Dr. White violated no Principles.

D.

[7] In late February 1981, Dr. White began seeing a child named Laura. Laura was in the custody of her mother, but Dr. White

sent his bills for his regular visits with Laura to her father. Laura's father had not known she was seeing Dr. White until he received the bill. Laura's father did not pay this bill or the next bill he received from Dr. White. Laura's father contacted Dr. White trying to obtain the total figure he owed Dr. White. White claimed he had sent complete bills to Laura's mother's attorney who was supposed to forward them to Laura's father.

In May 1982, there was a hearing in Wake County which resulted in a court order requiring Laura's father to pay her psychological bills. Dr. White's next statement to Laura's father reflected the wrong hourly billing rate ($10.00 too high for eight visits). The only statement in Dr. White's file had been altered to reflect the correct billing amount. Laura's father paid more than he owed because of the incorrect statement, and he never received a later bill which covered sessions subsequent to those on the statement. Dr. White refunded the overcharge to Laura's mother.

The Board claims Dr. White violated Principle 3c (quoted above) by "failing to maintain adequate and consistent records" of Laura's charges and billings. Although Dr. White's billing records are incomplete and somewhat haphazard, Dr. White's error in billing which totaled $80.00 does not constitute a violation of Laura's father's "legal and civil rights," particularly since a refund was paid.

The Board also concluded that Dr. White violated Principles 2e and 1f as follows:

> By inappropriately concluding that Laura [ ] had dyslexia or a dyslexic condition and testifying in court of this tentative diagnosis and that she had a learning disability, when the February 1981, test data did not prove or even suggest such a diagnosis, Respondent violated Principle 2(e), which provides that psychologists responsible for decisions involving individuals or policies based on test results have an understanding of psychological or educational measurement and test research, and Principle 1(f), which provides that psychologists know that they bear a heavy social responsibility because their recommendations and professional actions may alter the lives of others.

Principle 2e states:

> e. Psychologists responsible for decisions involving individuals or policies based on test results have an under-

standing of psychological or educational measurement, validation problems, and test results.

We agree with the Board's conclusion which is supported by the findings of fact, and we also find that there is sufficient evidence to support the conclusion that Dr. White violated this Principle. Dr. Grew testified extensively on this matter as follows:

Q    Were you able to find any basis from which one could or should conclude there was a learning disability there?

A    No.

Q    Was there any evidence of any problem in that test data?

A    Well, it was very hard to tell, because instruments were used that were either inappropriate or obsolete or inconclusive. And you know, also observing material from a distance and not having been with the child, you know, it is a very indirect observation.

Q    Have you reviewed the narrative of Dr. White's testimony at the hearing regarding Laura [ ]?

A    Yes; I have.

Q    In your opinion, could a licensed psychologist in North Carolina ethically make any statements about the probability of a learning disability in a court hearing at that time on the basis of the information available?

A    No.

Q    Do you have an opinion as to precisely why it could not ethically be done?

A    At that time, the child—the initial testing; at the time of the initial testing—the child was only four. It is very difficult to diagnose a learning disability in children under school age, primarily because the whole diagnosis is school based. One thing that I try to communicate to parents is that 'learning disability' is a label that school systems apply to categorize children who learn differently from the mainstream. And while it is a cultural phenomenon, it is an organic one as well.

But to diagnose a child prior to her entry into school with a learning disability doesn't make much sense to me.

I can't think of how much benefit that would be to the child, since the diagnosis—the diagnostic label—is directly related to predicting her performance in school.

. . .

Q Did you also review the material—testing material—which Dr. White supplied regarding the second round of testing?

A Yes.

Q Did you hear his comments about that testing?

A Yes.

Q And based on those materials and his own statements, do you find any basis for concluding or testifying that the child might have learning disability in the nature of the testimony which he gave?

A In the nature of his testimony?

Q Yes.

A No. Let me qualify that by saying that I was unable to determine on the basis of those test data whether the child's difficulties were either emotionally based or organically based. And the reason for that was that the instrumentation used to determine the presence of a learning disability was obsolete.

Dr. Grew's testimony, which was not rebutted by Dr. White, provided substantial evidence to support the Board's findings and conclusion. Dr. White testified only that if "[Laura] continued to have these kinds of problems, that indeed it would be like dyslexia."

The Board also concluded that Dr. White violated Principle 1f which provides that "psychologists know that they bear a heavy social responsibility because their recommendations and professional actions may alter the lives of others." It is unclear from the record the findings upon which this violation is based; therefore, we are unable to determine whether the evidence supports these findings and conclusions.

With regard to Laura, we therefore find that the evidence establishes that Dr. White violated only Principle 2e.

### E.

[8] In late December 1980, Dr. White first saw Sandra and Kevin. The children's father brought them to Dr. White after the children told their father about incidents of sexual abuse by their stepfather. As a result of the children's testimony and Dr. White's conclusion that the children had been abused, the court awarded the children's father temporary custody.

The children's mother then requested a second psychological opinion. Dr. White was opposed to such an evaluation because he thought that the children would suffer from having to recount the details of the abuse. The judge allowed a second opinion by Drs. Kilburn and Inman after Dr. Kilburn convinced the judge that a second opinion does not require the children to tell of the abusive incidents directly.

Dr. White accompanied the children to the second evaluation and requested that he be permitted to attend and tape record the session. He did not go into the session but he accompanied Kevin to his session and waited outside the doctor's office. The second evaluation affirmed Dr. White's conclusions and the court awarded the children's father custody and the mother was allowed limited visitation. The children's mother subsequently separated from her husband. Dr. White recommended that the children's mother undergo therapy to cope with what had happened and that her visitation with the children cease.

Dr. White saw the children's mother for awhile, but he did not think she was progressing. He referred the patient to the Wake County Mental Health Center.

The children's mother then began seeing Ms. Sandy Preissler, therapist. Dr. White sent Ms. Preissler a letter outlining the questions and the approach he thought she should take with this patient before reinstating visitation privileges. Ms. Preissler responded that she would handle her patient how she saw fit. Dr. White contacted the patient and her attorney and said he no longer recommended the Mental Health Center because the patient needed the help of an M.D. psychiatrist or a Ph.D. psychologist.

The Board found that Dr. White's actions violated Principles 1f and 3c. Principle 1f directs psychologists to know that their recommendations may influence other people's lives, and they should not misuse this influence.

**WHITE v. N.C. BD. OF EXAMINERS OF PRACTICING PSYCHOLOGISTS**

[97 N.C. App. 144 (1990)]

We have reviewed findings of fact numbers 35 through 42 and hold that these findings do not support the Board's conclusion that Dr. White violated Principle 1f. There is nothing in the findings which establishes that Dr. White misused his influence.

Principle 3c requires a psychologist to avoid any action which "will violate or diminish the legal and civil rights of clients . . . ." Again, we have reviewed the above findings of fact and hold that these findings simply do not support the conclusion that Dr. White violated a client's legal and civil rights. While his actions in this case may be considered inappropriate, and Dr. Grew testified to such, Dr. White's actions do not violate Principle 3c.

The Board also found Dr. White violated G.S. 7A-543 and Principle 3d by failing to report his suspicion of child abuse to the proper government agency. We agree with the Board that Dr. White violated this Principle.

Principle 3d states that "psychologists [must] adhere to relevant governmental laws and institutional regulations." G.S. 7A-543 states in part:

Any person or institution who has cause to suspect that any juvenile is abused or neglected shall report the case of that juvenile to the Director of the Department of Social Services in the county where the juvenile resides or is found.

Dr. White testified that he did not report the allegations of child sexual abuse as required by G.S. 7A-543. Dr. White argues on appeal that he did not report this as required because he thought the matter was already in the judicial system and the parents and attorneys knew of the alleged sexual abuse. G.S. 7A-543 makes no exceptions for extenuating circumstances in reporting suspected child abuse. Therefore, Dr. White technically violated the statute. In doing so, he also technically violated Principle 3d.

Finally, the Board also found Dr. White violated Principle 7b when he contacted the children's mother to persuade her to stop seeing Ms. Preissler at the Wake County Mental Health Center. Principle 7b states:

Psychologists know and take into account the traditions and practices of other professional groups with whom they work and cooperate fully with such groups. If a person is receiving similar services from another professional, psy-

chologists do not offer their own services directly to such a person. If a psychologist is contacted by a person who is already receiving similar services from another professional, the psychologist carefully considers that professional relationship and proceeds with caution and sensitivity to the therapeutic issues as well as the client's welfare. The psychologist discusses these issues with the client so as to minimize the risk of confusion and conflict.

In this instance, Dr. White did not offer his services in substitution of Ms. Preissler's but recommended the patient seek help from another practitioner with a different philosophy than Ms. Preissler. There is no evidence that this suggestion was made for any reason other than for the benefit of the client. Therefore, we find that the evidence establishes that Dr. White violated G.S. 7A-543 and Principle 3d with regard to Sandra and Kevin.

F.

[9] In the spring or summer of early 1981, Dr. Patricia Ramsey and Dr. White became involved in court proceedings regarding a minor patient, Lucrettia. Dr. White first evaluated Lucrettia in 1979, when she was visiting with her father and stepmother, Mr. and Mrs. "B." Sometime in 1981, the "Bs" began seeing Dr. Ramsey on a regular basis. Lucrettia's mother and stepfather, the "Ds," subsequently began seeing Dr. White along with Lucrettia for psychotherapy.

At the court proceeding in 1981, Drs. White and Ramsey submitted their opinions about custody and visitation concerning Lucrettia. The court entered an order that the parties continue counseling. Dr. White would continue to see the "Ds," and Dr. Ramsey, the "Bs" and Lucrettia. Dr. White later notified Dr. Ramsey and testified in the present hearing before the Board that the "Ds" had never been in therapy with him, and that he provided only minimal parental counseling to them.

Around Thanksgiving 1981, Dr. Ramsey was trying to arrange holiday visits for Lucrettia with the "B" family. The evidence indicates that Dr. White tried to inhibit the visits by failing to respond to letters and phone calls from Dr. Ramsey. Dr. White was supposed to get information from Dr. Ramsey about the visits and relay the messages to Mrs. "D."

On two occasions when joint sessions were planned between Dr. White, Dr. Ramsey and Lucrettia's parents or her stepparents, Dr. White cancelled at the last minute. When confronted about the cancellations, Dr. White responded that it was Mr. and Mrs. "B" who caused all the problems for Lucrettia.

Dr. Belovicz, a psychologist, was going to perform an independent evaluation of Lucrettia. Dr. White informed Dr. Belovicz that Mr. "B" was not Lucrettia's biological father, which Mr. "B" allegedly told Dr. White in professional confidence. Based on Dr. Belovicz's subsequent report, Dr. White wrote the families and their attorneys and recommended very restricted visitation for Mr. "B," but not the "Ds."

Findings of fact numbers 43 through 52 deal with the matter of Lucrettia. Dr. White excepted only to finding number 52:

> The pattern of Respondent's actions and communications in connection with his services to Lucrettia [ ] and the surrounding events establishes an increasing loss of objectivity along with an acceptance and identification with the [ ] point of view. The frequent criticism of actions by the [ ], and the lack of criticism of any action by the [ ], plus the frequent recommendations for termination or limitation of visitation (often shortly before the scheduled visitation) were inconsistent with the treatment goals of decreasing the hostility and tension in Lucrettia's surroundings and of treatment of her emotional disturbance. Such conduct by Respondent was not conducive to treating emotional disturbance and in fact would possibly increase or cause her additional emotional distress.

The Board concluded Dr. White's actions in Lucrettia's case violated Principles 1f, 3c, and 7b.

Dr. White's testimony at the hearing indicates that he made conclusions about visitation based solely on the patient's natural mother's statements that the child's stepmother was unstable.

Dr. White admits that Mrs. "D" (the child's natural mother) was his sole source for information, upon which he concluded that Lucrettia could not have overnight visits with the "Bs" (her father and stepmother). We find nothing in the evidence before us that Dr. White was under any obligation under the Principles to conduct further investigation before making his recommendations based

upon information from Mrs. "D" and therefore did not violate Principle 1f.

Dr. White was also charged with violating Principle 3c. As we previously stated, all custody and visitation matters affect someone's civil and legal rights. Again, Dr. White based his recommendations in this matter solely upon Mrs. "D's" information, who had an interest in preventing visitation with the father and stepmother. Although this may have had an effect on the "B's" civil and legal rights, there is no evidence that Dr. White was under a professional obligation under *Principle 3c to collect additional information before he made his recommendations.*

The Board further concluded that Dr. White violated Principle 7b which requires psychologists to "know and take into account the traditions and practices of other professional groups with whom they work and cooperate fully with such groups." Findings of fact 45, 47, 48 and 50 support this conclusion, and there is substantial evidence in the record to support the findings. Moreover, Dr. White did not except to these findings or conclusions in the record on appeal and did not argue this issue in his brief. Under Rule 10(a) and (b) of the N.C. Rules of Appellate Procedure, only exceptions noted in the record and brought forward as the basis for assignments of error may be considered on appeal. *State v. Kidd,* 60 N.C. App. 140, 143, 298 S.E.2d 406, 408 (1982), *disc. rev. denied,* 307 N.C. 700, 301 S.E.2d 393 (1983). *See also Anderson Chevrolet Olds v. Higgins,* 57 N.C. App. 650, 653, 292 S.E.2d 159, 161 (1982) (in the absence of exceptions, an appeal duly taken from a final judgment may present for review the question of whether the judgment is supported by the findings of fact and conclusions of law if properly raised in the brief). Therefore, we hold that Dr. White violated Principle 7b in the matter of Lucretia.

### G.

[10] The Board also concluded that Dr. White administered the wrong test to children. White used the Wechsler Intelligence Scale for Children (WISC) rather than the revised WISC-R which was issued in 1974. Dr. White failed to use the more updated version of the test when it was standard practice to do so in North Carolina. White also used the wrong computer program when he analyzed the test data. In addition, White administered the test to children who were too young to be taking it.

The Board found Dr. White's use of the WISC test on someone too young to take it violated Principle 2e. Principle 2e reads:

> Psychologists responsible for decisions involving individuals or policies based on test results have an understanding of psychological or educational measurement, validation problems, and test research.

We conclude Dr. White violated Principle 2e if the evidence supports the conclusion that the test is unreliable at a certain age. The transcript illustrates through the testimony of Dr. Robert Grew that "[t]he WISC is both inappropriate and obsolete." Dr. White maintains that there are few, if any, substantive differences between the WISC and the WISC-R, and he presented two professional articles in support of his argument. Upon closer examination of the articles, however, we find that these articles do not completely support his assertions. We therefore agree with the Board's ruling that Dr. White violated Principle 2e.

The Board further found that Dr. White violated Principle 8d for relying on the Wechsler Intelligence Scale for Children (WISC) in 1981, 1982, and thereafter, instead of the revised test (WISC-R), which generally replaced the WISC in 1974. We find that Dr. Grew's testimony contains substantial evidence of this violation.

Principle 8d requires psychologists to "recognize that assessment results may become obsolete . . . [and to] make every effort to avoid and prevent the misuse of obsolete measures." Dr. Grew's testimony that the WISC is an obsolete test substantially supports the Board's findings and conclusion.

Finally, the Board found that Dr. White violated Principles 8c and 8d by using WISC data in a computer program designed to analyze WISC-R results. Dr. White then allegedly permitted release of the report with no explanation that WISC data were used instead of WISC-R data. The report in question was placed in a child's school file.

We hold that the evidence supports the Board's conclusions that Dr. White violated Principle 8d for the same reasons set forth above. However, Dr. White did not violate Principle 8c which states:

> In reporting assessment results, psychologists indicate any reservations that exist regarding validity or reliability because of the circumstances of the assessment or the inappropriateness

of the norms for the person tested. Psychologists strive to ensure that the results of assessments and their interpretations are not misused by others.

Dr. White does not contest the fact that the report was placed in a child's school file. He contends, however, that he would not release such report without a cover letter explaining the report. There was insufficient evidence to the contrary. We therefore find that Dr. White did not violate Principle 8c in this instance.

In summary, we hold that the Preambles to the Ethical Principles of Psychologists are unconstitutionally vague for purposes of being cited for specific violations under amendments V and XIV to the United States Constitution and under article I, sec. 19 to the North Carolina Constitution. *In re Wilkins*, 294 N.C. 528, 242 S.E.2d 829 (1978). We further hold that Principles 1f, 2e, 3c, 3d, 5c, 7b, 8c, and 8d are constitutional under the test in *Wilkins* discussed in section I of this opinion.

Dr. White was charged with a total of 34 violations of the Preambles and Principles, any one of which potentially subjected his license to revocation. Of these charges, we hold that there was substantial evidence under the "whole record" test to support the Board's findings of fact and conclusions of law that Dr. White could be sanctioned for his violations of only six matters involving these Principles as follows: Principle 3c in the matter of "Shannon"; Principle 2e in the matter of "Laura"; Principle 3d and G.S. 7A-543 in the matter of "Sandra and Kevin"; Principle 7b in the matter of "Lucrettia"; and Principles 2e and 8d in administering the wrong test to children.

We note that although we hold these Principles constitutional, the Principles and the evidentiary application of them to the facts of this case are extremely general and troublesome to this Court. Psychologists, as well as all other professionals, have a right and fundamental need to be guided by Ethical Codes of Conduct of sufficient clarity and specificity to meet applicable constitutional standards and to adequately apprise practitioners of the boundaries of conduct. While we have concluded that those Principles in question meet such standards, suffice it to say that for the most part it is by the slimmest of margins.

We have also considered Dr. White's remaining assignments of error and find them to be without merit.

CHAPEL HILL COUNTRY CLUB v. TOWN OF CHAPEL HILL

[97 N.C. App. 171 (1990)]

Therefore, we remand this case under G.S. 150A-51 (recodified to 150B-51(b)) to the Board to consider whether, in view of the above violations of the Principles, Dr. White's license should be revoked or suspended under G.S. 90-270.15(a), or to take any other appropriate action under G.S. 90-270.15(e).

Affirmed in part, reversed in part and remanded.

Judges BECTON and JOHNSON concur.