JONATHAN FARBER, PH.D., PETITIONER v. NORTH CAROLINA PSYCHOLOGY
BOARD, RESPONDENT

No. COA01-725

(Filed 17 September 2002)

**1. Psychologists and Psychiatrists— disciplinary hearing—ex parte communications—bias—administrative and investigative functions**

The trial court erred in its review of a psychology board's disciplinary hearing by concluding that respondent board violated petitioner psychologist's statutory and constitutional rights based on the facts that the board excluded petitioner and his counsel from the initial probable cause hearing, the board subsequently denied the petition for disqualification of board members based on allegations of bias, and the board allegedly improperly commingled its prosecutorial, investigative, and adjudication functions, because: (1) the plain language of N.C.G.S. § 150B-40(a) provides that the prohibition of ex parte communication by agency members begins at the time of the notice of hearing, and the probable cause hearing took place two months before respondent issued its statement of charges and nine months before it issued the notice of hearing; (2) petitioner offered no specific facts or evidence of actual bias on the part of board members, and the board's mere exposure to an anonymous report presented in nonadversary investigative procedures is insufficient to establish bias or unfair prejudice; and (3) the board is empowered under N.C.G.S. §§ 90-270.9 and 90-270.15

1

to investigate as well as to adjudicate complaints against its licensees.

## 2. Costs— psychologist disciplinary hearing—calculation

The trial court erred by reversing the assessment of costs under N.C.G.S. § 90-270.15 to petitioner psychologist for a psychology disciplinary hearing, because: (1) there was no dispute as to the number of hours spent on the disciplinary proceeding; (2) no grounds existed for cross-examination concerning the basis or accuracy of the costs since the costs are controlled by the North Carolina Administrative Code; and (3) the evidence for the calculation of costs appeared in the record.

## 3. Psychologists and Psychiatrists— disciplinary hearing— inappropriate personal relationship

The trial court did not err in its review of a psychology board's disciplinary hearing by concluding that respondent psychology board's final decision regarding petitioner psychologist's inappropriate relationship with a patient was supported by substantial evidence, because: (1) the evidence as found by the board tended to show that petitioner entered into a personal relationship with a present patient in order to meet his emotional needs which is in violation of N.C.G.S. § 90-270.15(a)(10); (2) there was competent evidence that petitioner allowed the patient to end her therapy in order to pursue a personal relationship with him and that such behavior ultimately caused the patient to suffer severe depression which endangered her welfare in violation of N.C.G.S. § 90-270.15(a)(11); (3) the evidence as found by the board tended to show that petitioner entered into the relationship with his patient to gratify his own personal needs in violation of N.C.G.S. § 90-270.15(a)(20) and that the patient would not have ended her therapy but for her relationship with petitioner; (4) there was competent evidence that petitioner violated sections 1.13(a)-(c) of the psychologists' ethical standards since petitioner did not obtain professional consultation on his relationship but merely casually broached the subject with a colleague; (5) there was competent evidence that petitioner violated sections 1.14 and 1.15 of the psychologists' ethical standards since petitioner's actions resulted in foreseeable harm to his patient and petitioner's influence over his patient caused her to end her therapy; and (6) there was competent evidence that petitioner violated section 1.17(a) of the psychologists' ethical standards since petitioner inappropriately pursued a dual relationship with his

patient and continued to treat his patient in group therapy sessions while simultaneously exploring a social relationship with the patient.

**4. Declaratory Judgments— constitutionality of statute— conduct of licensed psychologists**

The trial court did not abuse its discretion in its review of a psychology board's disciplinary hearing by declining to issue a declaratory judgment regarding the constitutionality of N.C.G.S. § 90-270.15(a)(10) which sets forth governing principles for the conduct of the American Psychological Association's licensees, and the statute contains no unconstitutional delegation of legislative authority.

Judge GREENE concurring in part and dissenting in part.

Appeal by petitioner and respondent from order entered 21 March 2001 by Judge Wade Barber in Wake County Superior Court. Heard in the Court of Appeals 26 March 2002.

*Allen & Pinnix, P.A., by M. Jackson Nichols and Angela Long Carter, for petitioner appellee-appellant.*

*Attorney General Roy Cooper, by Assistant Attorneys General Sondra C. Panico and Robert M. Curran, for respondent appellee-appellant.*

*Attorney General Roy Cooper, by Assistant Attorney General Thomas R. Miller and Pamela Vesper Millward, for the North Carolina Real Estate Commission, amicus curiae.*

TIMMONS-GOODSON, Judge.

Dr. Jonathan Farber ("petitioner" or "Dr. Farber") and the North Carolina Psychology Board ("respondent" or "the Board") appeal from an order of the trial court vacating a final decision by the Board. For the reasons stated herein, we reverse in part the order of the trial court.

The facts pertinent to this appeal are as follows: Dr. Farber is a licensed psychologist practicing in Durham, North Carolina. On 28 April 1998, a former patient of Dr. Farber filed a complaint against him with the Board. The complaint alleged that Dr. Farber had engaged in an improper relationship of a romantic nature with the patient while she was under his care. The Board thereafter notified

FARBER v. N.C. PSYCHOLOGY BD.

[153 N.C. App. 1 (2002)]

Dr. Farber of the complaint and assigned a staff psychologist, Randy Yardley ("Yardley"), to investigate the matter and prepare a report.

On 1 and 2 October 1998, Yardley presented his report to the Board for its determination as to whether sufficient grounds existed for a statement of charges against Dr. Farber or for a formal hearing on the issues raised in the complaint. As per standard Board practice, the report was anonymous, with proper names redacted. Based on the report, the Board found that Dr. Farber's alleged conduct, if proven, would constitute a violation of several statutes and ethical standards. Accordingly, the Board issued a statement of charges against Dr. Farber and scheduled a formal hearing on the matter for 4 November 1999.

On 4 October 1999, counsel for Dr. Farber filed a petition for disqualification of certain Board members, alleging that they had improperly drawn conclusions concerning Dr. Farber's conduct based on Yardley's report submitted at the October meeting of the prior year. The petition set forth no specific facts to support the allegations of bias, but instead stated that the Board members' review of the anonymous report potentially created "irrevocabl[e] bias[] such that [the Board members] cannot provide a fair and impartial hearing[.]" The petition therefore requested that the matter be removed to the Office of Administrative Hearings. The petition further recited that the Board's procedure had deprived Dr. Farber of due process, in that neither he nor his counsel were allowed to attend the probable cause hearing. In addition to calling for the recusal of the allegedly biased Board members, the petition requested that counsel for Dr. Farber "be permitted to participate in separate examination of each Board member[.]"

The Board addressed Dr. Farber's petition at its 14 and 15 October 1999 meetings. An independent attorney, Assistant Attorney General Richard Slipsky, polled Board members, who responded that they had had no further communication regarding Dr. Farber's case following the report by Yardley during the previous year. Further, Board members stated that they had no written materials regarding the matter. Concluding that the petition failed to state sufficient grounds to initiate the procedures for determining disqualification of Board members or for due process violations, the Board denied Dr. Farber's petition.

The Board's formal hearing on the complaint filed against Dr. Farber took place on 4 and 5 November 1999 as scheduled. Dr. Farber

was present and represented by counsel, who presented evidence and conducted cross-examination of the witnesses. The evidence, as found by the Board, included the following facts: During an individual therapy session with his patient, Dr. Farber disclosed that he and his wife had separated. Dr. Farber thereafter "said or did things that started making [his patient] think that a romantic relationship [with Dr. Farber] could be possible[.]" These disclosures and further behavior by Dr. Farber led the patient to end her individual therapy because she believed her treatment had been compromised. The Board found that the patient "would not have ended therapy with [Dr. Farber] if there had been no thought of a relationship with him outside of therapy." Dr. Farber and the patient subsequently began a relationship outside of therapy with the intent of "get[ting] to know one another, to see if they would be a good match romantically[.]" The patient then ended her participation in group therapy because of her relationship with Dr. Farber. The Board also found that Dr. Farber "did not consult with a psychologist about the circumstances of the relationship[,]" but that he did discuss the situation informally with a colleague, who advised him that such an arrangement was "hazardous" and that Dr. Farber "ought to be careful about it."

Based on these and other findings, the Board concluded that Dr. Farber had violated several statutes and ethical standards regulating the professional conduct of psychologists. The Board therefore suspended Dr. Farber's professional license for a period of two years, thirty days of which were active, with the remaining period subject to probation. The Board also ordered Dr. Farber to pay the costs of the disciplinary proceeding, which were "calculated by the Board's Executive Director as $4,050.00."

On 27 March 2000, Dr. Farber filed a petition for declaratory judgment and judicial review of the Board's decision. The petition requested that the court vacate the Board's decision and declare a certain section of the Psychology Practice Act unconstitutional. The matter came before the trial court on 7 September 2000, at which time the trial court concluded that, although the decision was supported by substantial evidence, the Board's actions had violated Dr. Farber's due process and statutory rights. Specifically, the trial court concluded that the petition filed by Dr. Farber for disqualification of the Board members set forth "sufficient allegations of bias such that Petitioner should have been afforded the opportunity to examine the Board members for possible bias." The trial court further concluded that Yardley's report to the Board constituted an *ex parte* communi-

cation that, while "not a technical violation" of the North Carolina General Statutes, nevertheless "constituted a violation of the spirit of the statutory prohibition" against *ex parte* communications. The trial court also concluded that the Board had improperly commingled investigative and adjudicative functions in violation of statutory law. Based on these conclusions, the trial court vacated the decision of the Board. Finally, the trial court declined to issue a declaratory judgment regarding the constitutionality of the Psychology Practice Act. It is from this order that the Board ("respondent") and Dr. Farber ("petitioner") now appeal.

Respondent presents two issues for review on appeal, arguing that the trial court erred in (1) concluding that respondent violated petitioner's statutory and constitutional rights and (2) reversing the assessment of costs to petitioner. Petitioner argues that the trial court erred in (1) determining that respondent's final decision was supported by substantial evidence and (2) declining to issue a declaratory judgment regarding the constitutionality of section 90-270.15(a)(10) of the North Carolina General Statutes. We address these issues in turn.

### I. Respondent's Appeal

[1] Respondent first argues that the trial court erred in concluding that its actions violated petitioner's statutory and due process rights. On appeal, we review the record to determine if competent evidence exists to support the trial court's findings of fact and, in light of those findings, whether the conclusions of law are proper. *See Lewis v. Edwards*, 147 N.C. App. 39, 48, 554 S.E.2d 17, 23 (2001). This Court is bound by the trial court's findings of fact, if they are based on competent evidence. *See Wright v. Auto Sales, Inc.*, 72 N.C. App. 449, 452, 325 S.E.2d 493, 495 (1985). Conclusions of law, however, are fully reviewable on appeal. *See id.*

Article 18A of Chapter 90 of the North Carolina General Statutes is entitled the "Psychology Practice Act." *See* N.C. Gen. Stat. § 90-270.1(a) (2001). The practice of psychology in North Carolina is regulated under this Act in order "to protect the public from the practice of psychology by unqualified persons and from unprofessional conduct by persons licensed to practice psychology." N.C. Gen. Stat. § 90-270.1(b) (2001). The North Carolina Psychology Board is responsible for overseeing licensed psychologists practicing in this State, and it may discipline licensees who violate ethical or professional

standards. *See* N.C. Gen. Stat. § 90-270.15(a) (2001). Disciplinary actions by the Board are governed by the Administrative Procedure Act. *See* N.C. Gen. Stat. § 90-270.15(e) (2001). "The Board is required to provide the opportunity for a hearing under Chapter 150B to any . . . licensee before revoking, suspending, or restricting a license . . . or imposing any other disciplinary action or remediation." *Id.* Notice of the hearing must be given not less than fifteen days before the hearing. *See* N.C. Gen. Stat. § 150B-38(b) (2001). Such "[h]earings shall be conducted in a fair and impartial manner" and

> the parties shall be given an opportunity to present evidence on issues of fact, examine and cross-examine witnesses, including the author of a document prepared by, on behalf of or for the use of the agency and offered into evidence, submit rebuttal evidence, and present arguments on issues of law or policy.

N.C. Gen. Stat. § 150B-40(a) (2001).

In the case at bar, there is no dispute that the Board complied with the above-stated statutory requirements, providing proper notice and an opportunity for petitioner to be heard at the formal hearing. Petitioner presented evidence and had the opportunity to cross-examine witnesses, including Yardley, who was present at the hearing. The trial court nevertheless concluded that petitioner's rights had been violated, in that the Board: (1) excluded petitioner and his counsel from the initial probable cause hearing; (2) subsequently denied the petition for disqualification of Board members based on allegations of bias; and (3) improperly commingled its prosecutorial, investigative and adjudicative functions in violation of statutory law. We examine these actions by the Board and the trial court's conclusions regarding such actions in turn.

### A. Ex Parte Communications

The trial court determined that respondent violated petitioner's due process and statutory rights by holding the initial probable cause hearing outside the presence of petitioner or petitioner's counsel. Section 150B-40 of the North Carolina General Statutes provides, in pertinent part, that:

> Unless required for disposition of an ex parte matter authorized by law, a member of an agency assigned to make a decision or to make findings of fact and conclusions of law in a contested case under this Article shall not communicate, directly or indirectly, in connection with any issue of fact or question of law, with any per-

son or party or his representative, except on notice and opportunity for all parties to participate. *This prohibition begins at the time of the notice of hearing.* An agency member may communicate with other members of the agency and may have the aid and advice of the agency staff other than the staff which has been or is engaged in investigating or prosecuting functions in connection with the case under consideration or a factually-related case.

N.C. Gen. Stat. § 150B-40(d) (2001) (emphasis added).

In the instant case, respondent excluded petitioner from participating in the 1-2 October 1998 probable cause hearing. Respondent issued its statement of charges against petitioner on 11 December 1998, and a notice of hearing was given on 20 July 1999. Although the trial court recognized that petitioner's exclusion from the hearing was "not a technical violation" of section 150B-40(d), it nonetheless concluded that such action was a "violation of the spirit of the statutory prohibition." We disagree.

Under the plain language of section 150B-40(d), the prohibition on *ex parte* communication by agency members "begins at the time of the notice of hearing." N.C. Gen. Stat. § 150B-40(d). The probable cause hearing took place two months before respondent issued its statement of charges, and nine months before it issued the notice of hearing. As the probable cause hearing occurred well before the statutory prohibition on *ex parte* communications arose, the trial court erred in concluding that respondent violated section 150B-40(d), all "spirit" notwithstanding. Moreover, the trial court specifically found that, "[b]ased upon the evidence of Record, no *ex parte* contact between Board staff and Board members occurred after the Board issued its Notice of Hearing." We therefore conclude that respondent conducted no impermissible *ex parte* communication, and the trial court erred in concluding otherwise. We now turn to respondent's denial of the petition for disqualification of Board members for bias.

### B. Disqualification for Bias

The trial court concluded that the petition for disqualification set forth "sufficient allegations of bias such that Petitioner should have been afforded the opportunity to examine the Board members for possible bias. The Board's failure to afford him that opportunity to examine for bias violated Petitioner's statutory and constitutional rights." Respondent contends that the trial court erred in so concluding. We agree.

**FARBER v. N.C. PSYCHOLOGY BD.**

[153 N.C. App. 1 (2002)]

A fair trial before an impartial tribunal is a fundamental requirement of due process. *See Withrow v. Larkin*, 421 U.S. 35, 46, 43 L. Ed. 2d 712, 723 (1975). "This applies to administrative agencies which adjudicate as well as to courts." *Id.* When performing their quasi-judicial functions, agency members "must be able to set aside their prior knowledge and preconceptions concerning the matter at issue, and base their considerations solely upon the evidence adduced at the hearing." *Crump v. Bd. of Education*, 326 N.C. 603, 616, 392 S.E.2d 579, 586 (1990). There is a crucial distinction, however, between a Board member's disqualifying *bias* against a particular petitioner and permissible pre-hearing *knowledge* about a petitioner's case. *See id.* "[M]ere familiarity with the facts of a case gained by an agency in the performance of its statutory duties does not disqualify it as a decisionmaker." *Thompson v. Board of Education*, 31 N.C. App. 401, 412, 230 S.E.2d 164, 170 (1976), *reversed on other grounds*, 292 N.C. 406, 233 S.E.2d 538 (1977).

Regarding bias in the context of an administrative agency, the United States Supreme Court has cautioned that

> [t]he contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Withrow*, 421 U.S. at 47, 43 L. Ed. 2d at 723-24. This Court has echoed the Supreme Court's warning, stating that "there is no per se violation of due process when an administrative tribunal acts as both investigator and adjudicator on the same matter." *Hope v. Charlotte-Mecklenberg Bd. of Education*, 110 N.C. App. 599, 603-04, 430 S.E.2d 472, 474-75 (1993). Thus, "[a]bsent a showing of actual bias or unfair prejudice petitioner cannot prevail." *Id.* at 604, 430 S.E.2d at 475.

In the case *sub judice*, petitioner offered no specific facts or evidence of actual bias on the part of Board members. The petition for disqualification instead rested entirely on petitioner's assertions that his case related to "specific and unique events" which "the Board members will remember when this case is heard." Because of the

allegedly singular quality of the events in question, petitioner declared that "the Board members . . . are likely to have already drawn conclusions and opinions" such that they were "irrevocably biased" and incapable of providing a fair and impartial hearing.

We conclude that petitioner failed to meet his burden of demonstrating bias by the Board members. *See Crump*, 326 N.C. at 617, 392 S.E.2d at 586 (noting that, "because of their multi-faceted roles as administrators, investigators and adjudicators, school boards are vested with a presumption that their actions are correct, and the burden is on a contestant to prove otherwise"). Petitioner presented no evidence, other than his own presumptions, that the Board members had any preconceptions regarding the matter or would be incapable of basing their consideration of petitioner's case solely on the evidence adduced at the formal hearing. Indeed, all evidence was to the contrary. Yardley's report, submitted to the Board more than a year before the formal hearing, was anonymous, containing no proper names or other identifying information. When polled, Board members stated that they had no communication concerning petitioner's case after the initial probable cause hearing, nor possessed any written materials concerning the meeting or the case. Moreover, contrary to petitioner's assertions, we perceive nothing particularly salacious or unusual in the events surrounding petitioner's case such as to render the matter unique or memorable. In fact, when specifically questioned about petitioner's case, Board members denied having any memory of the original review of the facts that would prevent a fair and impartial decision.

Because petitioner failed to present sufficient grounds for bias, the Board was not obligated to grant petitioner's request for *voir dire* or to exclude Board members from consideration of petitioner's case. To decide that the Board's mere exposure to an anonymous report is "sufficient to establish bias or unfair prejudice would amount to a per se rule of unconstitutionality, completely disregarding the presumption that the Board acted correctly and the presumption of honesty and integrity in those serving as adjudicators." *Hope*, 110 N.C. App. at 603, 430 S.E.2d at 474; *see also Withrow*, 421 U.S. at 55, 43 L. Ed. 2d at 728 (stating that, "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing"). The trial court therefore erred in concluding that the Board violated petitioner's statutory or due process rights by denying his petition for disqualification. We now examine the trial court's conclu-

sion that respondent impermissibly commingled prosecutorial, investigative, and adjudicative functions.

### C. Administrative and Investigative Functions by the Board

The trial court concluded that the Board's procedure of conducting its initial probable cause hearing *ex parte*, with the same Board members later adjudicating petitioner's case, unlawfully "commingl[ed] the prosecutorial, investigative and adjudicative functions, contrary to N.C.G.S. § 150B-1(a)[.]" Respondent argues that its procedure adequately protected petitioner's due process and statutory rights. We agree.

Section 150B-1(a) of the North Carolina General Statutes sets forth the general purpose behind the Administrative Procedure Act, which is to "establish[] a uniform system of administrative rule making and adjudicatory procedures for agencies" in order to "ensure that the functions of rule making, investigation, advocacy, and adjudication are not all performed by the same person in the administrative process." N.C. Gen. Stat. § 150B-1(a) (2001). Neither the Administrative Procedure Act nor due process, however, requires strict separation between agency functions. *See Withrow*, 421 U.S. at 58, 43 L. Ed. 2d at 730 (noting that, "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation"); *Harrell v. Wilson County Schools*, 58 N.C. App. 260, 266, 293 S.E.2d 687, 691 (noting that the fact that an administrative tribunal acts in the triple capacity of complainant, prosecutor and judge does not violate due process), *disc. review denied*, 306 N.C. 740, 295 S.E.2d 759 (1982), *cert. denied*, 460 U.S. 1012, 75 L. Ed. 2d 481 (1983). Rather, the "sufficiency of the procedures employed must be evaluated in light of the parties, the subject matter, and the circumstances involved." *Presnell v. Pell*, 298 N.C. 715, 723, 260 S.E.2d 611, 616 (1979).

In *Withrow*, the United States Supreme Court addressed the issue of procedural due process requirements in the context of hearings before occupational licensing boards. Specifically, the question before the Court was whether the Wisconsin Medical Board's procedure of determining probable cause in an investigatory hearing and later adjudicating those charges violated the physician-licensee's due process rights. The Court noted that it is

> very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of

charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.

*Withrow*, 421 U.S. at 56, 43 L. Ed. 2d at 729. Accordingly, the Court held that the Medical Board's procedure did not violate the physician's constitutional or statutory rights.

We conclude that respondent did not violate petitioner's statutory or due process rights in the instant case. The Board is statutorily empowered to investigate as well as to adjudicate complaints against its licensees. *See* N.C. Gen. Stat. §§ 90-270.9, 90-270.15 (2001). Here, the Board employed a staff psychologist to investigate the complaint and submit an anonymous report in order to determine whether sufficient grounds existed to issue charges against petitioner. A hearing was not held on the matter until a year later, at which time petitioner presented evidence and cross-examined witnesses. In accordance with *Withrow*, we determine that the trial court erred in concluding that respondent violated petitioner's due process and statutory rights by impermissibly commingling its investigative, adjudicative and prosecutorial functions. We turn, therefore, to respondent's second assignment of error.

[2] By respondent's second assignment of error, respondent argues that the trial court erred in reversing the Board's assessment of costs against petitioner. In its final decision, the Board fined petitioner $4,050.00, which represented the costs of the disciplinary proceeding as calculated by the Board's Executive Director. The trial court found, however, that there was no evidence in the record to support this calculation, and that petitioner "was never afforded the opportunity to cross-examine the basis or accuracy of such costs." Respondent contends that, as there is no dispute as to the number of hours spent on the disciplinary proceeding, and because the costs of the proceeding is controlled by the North Carolina Administrative Code, no grounds existed for cross-examination. Further, respondent asserts that the evidence for the calculation of costs appears in the record. We agree with respondent.

Section 90-270.15 of the North Carolina General Statutes provides that "[t]he Board may assess costs of disciplinary action against an applicant or licensee found to be in violation of this Article." N.C. Gen. Stat. § 90-270.15(c) (2001). The North Carolina Administrative Code sets the hourly rate for such disciplinary proceedings as "three

FARBER v. N.C. PSYCHOLOGY BD.

[153 N.C. App. 1 (2002)]

hundred dollars ($300.00) per hour for a hearing which results in disciplinary action, with a minimum charge of three hundred dollars ($300.00) for the first hour or portion thereof, and then prorated thereafter for each half-hour[.]" N.C. Admin. Code tit. 21, r. 54.1605(11)(c) (June 2002). In the instant case, the transcript reflects that the disciplinary proceeding against petitioner lasted for thirteen hours and three minutes. When multiplied by the rate set forth in the Administrative Code, the costs of the proceeding totals $4,050.00, the amount assessed against petitioner.

We conclude that the trial court erred in finding that there was no evidence in the record to support respondent's assessment of costs. The transcript clearly and undisputedly recites the total number of hours spent on the disciplinary proceeding, the costs of which are mandated by the Administrative Code. Moreover, as the Board adhered to the statutory guidelines, and properly applied the mathematical formula in determining the costs, petitioner suffered no prejudice in being denied the opportunity to cross-examine the basis or accuracy of such costs. Thus, the trial court erred in reversing respondent's assessment of costs against petitioner.

We now address petitioner's assignments of error on appeal.

## II. Petitioner's Appeal

[3] Petitioner argues that the trial court erred in determining that respondent's final decision was supported by substantial evidence of record. Petitioner asserts that his actions violated neither statutory nor ethical standards, and that the Board's findings of fact are not based on substantive evidence. Petitioner further contends that the Board's conclusions of law, based upon improper findings of fact, are likewise invalid.

In an adjudicatory proceeding, an administrative body's responsibility is "to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence." *Comr. of Insurance v. Rate Bureau*, 300 N.C. 381, 406, 269 S.E.2d 547, 565 (1980). "An agency may use its experience, technical competence, and specialized knowledge in the evaluation of evidence presented to it." N.C. Gen. Stat. § 150B-41(d) (2001). "One of the purposes behind the creation of administrative agencies was the necessity for the supervision and experience of specialists in difficult and complicated fields." *Lackey v. Dept. of Human Resources*, 306 N.C. 231, 237, 293 S.E.2d 171, 176 (1982).

Upon judicial appeal from an agency, the trial court may reverse or modify an agency's decision if it is "[u]nsupported by substantial evidence . . . in view of the entire record as submitted[.]" N.C. Gen. Stat. § 150B-51(b)(5) (2001). The "whole record" test requires the reviewing court to examine all competent evidence to determine whether the agency decision is supported by substantial evidence. *See N.C. Dept. of Correction v. Myers*, 120 N.C. App. 437, 441, 462 S.E.2d 824, 826-27 (1995), *affirmed per curiam*, 344 N.C. 626, 476 S.E.2d 364 (1996). The administrative findings of fact, if supported by substantial evidence in view of the entire record, are conclusive upon a reviewing court. *See In re Berman*, 245 N.C. 612, 616-17, 97 S.E.2d 232, 235 (1957). Notably, "[t]he 'whole record' test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result." *Thompson v. Board of Education*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977).

Petitioner argues that there was no substantial evidence to support respondent's findings of fact that an improper relationship existed between patient and petitioner. We disagree. According to patient's testimony, when petitioner first informed patient about his divorce, "we spent a lot of time in my sessions talking about what he was going through." Patient testified that prior to these discussions, she had not contemplated terminating her therapy with petitioner, but she did so

after things that he said to me that started making me think that a romantic relationship could be possible. . . . [W]e had . . . eye contact for awhile. And he said . . . "I wish this moment could last forever." At one point, he told me how much his, you know, parents and kids would like me.

Patient further testified that after a "series of provocative remarks and after me talking about my feelings . . . I just said, 'Please, just tell me once and for all that a relationship between you and me is not possible.' " Petitioner testified that he responded, "I can't. I need time to think about it." After this, patient and petitioner met outside of therapy and established a schedule for their personal relationship, even though patient continued to attend group therapy with petitioner.

Eventually, patient informed petitioner in writing that she would stop attending group therapy as well, because

discontinuing group is the only right thing to do. It makes me very sad. But the bottom line (and you hit on this most recently) is that even if it would upset just one member that's too much. So, primarily in the name of morality, but also to protect any future repercussions to your situation, this is what I'm going to do.

Petitioner does not deny these events, merely their characterization. Petitioner conceded that he "exercised bad judgment in this case" and testified that, "I wouldn't do it again. It is too risky for the client and too risky for me too." Based on our review of the record, we conclude there was competent evidence in the record to support the Board's findings.

We further conclude that the Board's findings of fact supported its conclusions of law. The Board concluded that petitioner's conduct violated sections 90-270.15(a)(10), 90-270.15(a)(11), and 90-270.15(a)(20) of the North Carolina General Statutes. Section 90-270.15(a)(10) provides that a psychologist violates the Code of Conduct when the psychologist "[h]as been guilty of immoral, dishonorable, unprofessional, or unethical conduct as defined in this subsection, or in the then-current code of ethics of the American Psychological Association[.]" N.C. Gen. Stat. § 90-270.15(a)(10) (2001). The evidence, as found by the Board, tended to show that petitioner entered into a personal relationship with a present patient in order to meet his own emotional needs. Such evidence supports the Board's conclusion that petitioner violated section 90-270.15(a)(10).

Section 90-270.15(a)(11) provides that a psychologist violates the Code of Conduct when he "[h]as practiced psychology in such a manner as to endanger the welfare of clients or patients[.]" N.C. Gen. Stat. § 90-270.15(a)(11) (2001). There was competent evidence before the Board, and the Board so found, that petitioner allowed the patient to end her therapy in order to pursue a personal relationship with him, and that such behavior ultimately caused the patient to suffer severe depression, thereby endangering her welfare. We determine that these findings support the Board's conclusion that petitioner violated section 90-270.15(a)(11).

Section 90-270.15(a)(20) of the North Carolina General Statutes provides that a psychologist violates the Code of Conduct when he "[h]as exercised undue influence in such a manner as to exploit the client . . . for the financial or other personal advantage or gratification of the psychologist[.]" N.C. Gen. Stat. § 90-270.15(a)(20) (2001). As stated above, the Board found that petitioner entered into the rela-

tionship with his patient to gratify his own personal needs, and that the patient would not have ended her therapy but for her relationship with petitioner. We conclude that these findings support the Board's conclusion that petitioner violated section 90-270.15(a)(20).

Petitioner further argues that the Board improperly concluded that petitioner violated ethical standards 1.13(a)-(c), 1.14, 1.15, and 1.17(a) of the *Ethical Principles of Psychologists and Code of Conduct*. Standard 1.13 provides, in pertinent part, that:

> (a) Psychologists recognize that their personal problems and conflicts may interfere with their effectiveness. Accordingly, they refrain from undertaking an activity when they know or should know that their personal problems are likely to lead to harm to a patient, client . . . or other person to whom they may owe a professional or scientific obligation.

> (b) In addition, psychologists have an obligation to be alert to signs of, and to obtain assistance for, their personal problems at an early stage, in order to prevent significantly impaired performance.

> (c) When psychologists become aware of personal problems that may interfere with their performing work-related duties adequately, they take appropriate measures, such as obtaining professional consultation or assistance, and determine whether they should limit, suspend, or terminate their work-related duties.

American Psychological Association, *Ethical Principles of Psychologists and Code of Conduct*, ethical standard 1.13 (1992). The Board concluded that petitioner violated these ethical principles by entering into a destructive personal relationship with his patient while she was still undergoing therapy. Petitioner did not obtain professional consultation on his relationship, but merely "casually broached the subject" with a colleague, who advised petitioner that such a situation was "hazardous." We determine that the Board did not err in concluding that petitioner violated sections 1.13(a)-(c) of the ethical standards.

The Board further concluded that petitioner violated ethical standard 1.14, which admonishes psychologists to "take reasonable steps to avoid harming their patients or clients . . . and to minimize harm where it is foreseeable and unavoidable[,]" and also violated ethical standard 1.15, which recites that, "[b]ecause psychologists'

scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence." *Id.*, ethical standards 1.14, 1.15. The Board found that petitioner's relationship with his patient had violated these standards in that petitioner's actions resulted in foreseeable harm to his patient, and that petitioner's influence over his patient caused her to end her therapy. We conclude that the Board's findings properly support its conclusion that petitioner violated ethical standards 1.14 and 1.15.

Finally, the Board concluded that petitioner violated ethical standard 1.17(a), which provides, in pertinent part, as follows:

A psychologist refrains from entering into or promising another personal . . . relationship . . . if it appears likely that such a relationship reasonably might impair the psychologist's objectivity or otherwise interfere with the psychologist's effectively performing his or her functions as a psychologist, or might harm or exploit the other party.

*Id.*, ethical standard 1.17(a). The evidence and the Board's findings clearly showed that petitioner inappropriately pursued a dual relationship with his patient. Petitioner continued to treat his patient in group therapy sessions while simultaneously exploring a social relationship with the patient. We therefore conclude that the Board's findings support its conclusion that petitioner violated ethical standard 1.17(a).

Because there was substantial evidence of record to support the Board's findings of fact, which in turn supported its conclusions of law, the trial court did not err in concluding that the Board's decision was supported by substantial evidence. We therefore overrule petitioner's first assignment of error.

[4] By his second assignment of error, petitioner argues that the trial court erred when it refused to render a declaratory judgment regarding the constitutionality of section 90-270.15(a)(10) of the North Carolina General Statutes. We disagree. "The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding[.]" N.C. Gen. Stat. § 1-257 (2001). The trial court's decision to grant or deny such relief will be reversed only upon a showing of abuse of discretion. *See Coca-Cola*

*Bottling Co. Consol. v. Durham Coca-Cola Bottling Co.*, 141 N.C. App. 569, 577-78, 541 S.E.2d 157, 163 (2000), *disc. review denied*, 353 N.C. 370, 547 S.E.2d 433 (2001).

In the instant case, it is clear that a declaration by the trial court regarding the constitutionality of section 90-270.15(a)(10) would not have terminated the controversy between petitioner and respondent. Respondent concluded in its decision that petitioner violated numerous statutory sections, not merely section 90-270.15(a)(10). Moreover, the trial court granted petitioner substantial relief in its order by vacating the decision of respondent. Having granted petitioner this relief on the basis of due process violations, the trial court obviously decided that further grounds for relief were unnecessary and would serve no useful purpose. *See Coca-Cola Bottling Co. Consol.*, 141 N.C. App. at 578-79, 541 S.E.2d at 163. Petitioner has advanced no grounds for abuse by the trial court of its discretion in this matter, nor do we perceive such. We therefore overrule this assignment of error.

Although we conclude that the trial court did not abuse its discretion in declining to issue a declaratory judgment regarding the constitutionality of section 90-270.15(a)(10), we nevertheless consider petitioner's contention that the section is unconstitutional. Petitioner asserts that the statutory section, which incorporates the code of ethics of the American Psychological Association ("APA"), is an unconstitutional delegation of legislative authority. Petitioner therefore contends that the application of the APA's code of ethics violated his due process rights.

In determining the constitutionality of section 90-270.15(a)(10), we begin with the well-established principle that a statute enacted by the General Assembly is presumed to be constitutional. *See Wayne County Citizens Assn. v. Wayne County Bd. of Comrs.*, 328 N.C. 24, 29, 399 S.E.2d 311, 314-15 (1991). "A statute will not be declared unconstitutional unless this conclusion is so clear that no reasonable doubt can arise, or the statute cannot be upheld on any reasonable ground." *Id.* at 29, 399 S.E.2d at 315. The wisdom and expediency of an enactment is a legislative and not a judicial decision. *See In re Housing Bonds*, 307 N.C. 52, 57, 296 S.E.2d 281, 284 (1982). "Where a statute is susceptible of two interpretations, one of which is constitutional and the other not, the courts will adopt the former and reject the latter." *Wayne County Citizens Assn.*, 328 N.C. at 29, 399 S.E.2d at 315.

Section 90-270.15(a)(10) authorizes the Board to discipline licensees whose conduct violates either the statutorily-defined Code of Conduct, or the "then-current code of ethics of the American Psychological Association, except as the provisions of such code of ethics may be inconsistent and in conflict with the provisions of this Article, in which case, the provisions of this Article control[.]" N.C. Gen. Stat. § 90-270.15(a)(10). Petitioner asserts that this section improperly delegates authority over standards for ethical behavior of psychologists to a private agency. Petitioner argues that, as the APA may revise such standards without notice or opportunity to be heard, the incorporation of such standards in the General Statutes violates petitioner's procedural and substantive due process rights. We disagree.

We do not conclude that discretionary reference to the ethical code of the American Psychology Association for purposes of determining improper behavior by a licensee to be a delegation of legislative authority to the APA. "When a legislature adopts the standards of a private organization into a statutory scheme . . . the incorporation is not always a delegation of legislative power." *Madrid v. St. Joseph Hosp.*, 122 N.M. 524, 530, 928 P.2d 250, 256 (1996). Courts in other jurisdictions that have addressed the adoption of private standards by their legislatures have articulated numerous compelling rationales for permitting such adoptions. As noted by the Supreme Court of Maryland:

> [C]ourts have sometimes upheld legislative adoption of private organizations' standards which are periodically subject to revision, in limited circumstances such as where the standards are issued by a well-recognized, independent authority, and provide guidance on technical and complex matters within the entity's area of expertise. These cases usually involve accreditation or similar programs by established professional organizations.

*Board of Trustees v. City of Baltimore*, 317 Md. 72, 96-97, 562 A.2d 720, 731 (1989), *cert. denied*, 493 U.S. 1093, 107 L. Ed. 2d 1069 (1990). The Maryland Court held that where the statutory adoption of private standards is merely advisory, rather than mandatory upon the agency applying the standards, there is no delegation of legislative authority. *See id.* at 98, 562 A.2d at 732.

Further, where a private organization's standards have significance independent of a legislative enactment, they may be incorporated into a statutory scheme without offending constitutional

restrictions on delegation of legislative powers. This is because "[a] private entity's standards cannot be construed as a deliberate law-making act when their development of the standards is guided by objectives unrelated to the statute in which they function." *Madrid*, 122 N.M. at 531, 928 P.2d at 257; *see also Lucas v. Maine Com'n of Pharmacy*, 472 A.2d 904, 909 (Me. 1984) (applying the principle that, " 'statutes whose operation depends upon private action which is taken for purposes which are independent of the statute' usually pass constitutional muster") (quoting Kenneth C. Davis, *Administrative Law Treatise* § 3:12 (2d ed. 1978)).

The above-stated grounds for incorporating the standards of a private entity without finding a delegation of legislative authority are applicable to the incorporation of the APA's ethical code in section 90-270.15(a)(10). This section permits the Board to apply the ethical standards of a well-recognized, independent authority, whose standards were developed in order to provide guidance on complex issues of morality and professional behavior among psychologists. There is no evidence that the APA's objective in developing its standards was in any way guided by legislative considerations. Moreover, application of the APA's standards is left to the discretion of the Board "except as the provisions of [the APA] may be inconsistent and in conflict with the provisions of this Article, in which case, the provisions of this Article control[.]" N.C. Gen. Stat. § 90-270.15(a)(10).

Our Supreme Court has held that:

[w]hen there is an obvious need for expertise in the achievement of legislative goals the General Assembly is not required to lay down a detailed agenda covering every conceivable problem which might arise in the implementation of the legislation. It is enough if general policies and standards have been articulated which are sufficient to provide direction to an administrative body possessing the expertise to adapt the legislative goals to varying circumstances.

*Adams v. Dept. of N.E.R. and Everett v. Dept. of N.E.R.*, 295 N.C. 683, 698, 249 S.E.2d 402, 411 (1978). Section 90-270.15(a)(10) authorizes the Board to utilize the principles set forth by the APA to govern the conduct of its licensees, which principles this Court has specifically held to be constitutional. *See White v. N.C. Bd. of Examiners of Practicing Psychologists*, 97 N.C. App. 144, 152, 388 S.E.2d 148, 153, *disc. review denied*, 326 N.C. 601, 393 S.E.2d 891 (1990). We further note that petitioner testified that he was aware of and had personally

reviewed the guidelines established by the APA. We therefore hold that section 90-270.15(a)(10) contains no unconstitutional delegation of legislative authority, and that petitioner's due process rights were not violated therefrom.

In conclusion, we hold that the trial court erred in concluding that respondent violated petitioner's constitutional or statutory rights, and in reversing respondent's assessment of costs against petitioner. We further hold that the trial court correctly concluded that respondent's decision was supported by substantial evidence of record. Moreover, we hold that the trial court did not abuse its discretion in declining to render declaratory judgment as to the constitutionality of section 90-270.15(a)(10) of the Psychology Practice Act. Finally, we hold that section 90-270.15(a)(10) does not constitute an improper delegation of legislative authority. We therefore reverse in part the order of the trial court and remand this matter for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part, and remanded.

Judge HUNTER concurs.

Judge GREENE concurs in part and dissents in part.

GREENE, Judge, concurring in part and dissenting in part.

I agree with the majority that N.C. Gen. Stat. § 90-270.15(a)(10) does not constitute an improper delegation of legislative authority. I further agree that "there is no per se violation of due process when an administrative tribunal acts as both investigator and adjudicator on the same matter." *Hope v. Charlotte-Mecklenburg Bd. of Educ.*, 110 N.C. App. 599, 603-04, 430 S.E.2d 472, 474-75 (1993). The actions of the Board in this case, however, constituted a violation of N.C. Gen. Stat. § 150B-40(d) and section 54.2308(e)(3) of the North Carolina Administrative Code. Accordingly, I respectfully dissent in part.

I

*Overlap of Investigative and Adjudicative Roles*

Pursuant to the Psychology Practice Act, the procedures for suspension of a psychologist's license or other disciplinary actions must be "in accordance with the provisions of Chapter 150B," the Administrative Procedure Act. N.C.G.S. § 90-270.15(e) (2001). The

procedures established by Chapter 150B "ensure that the functions of rule making, investigation, advocacy, and adjudication are not all performed by the same person in the administrative process." N.C.G.S. § 150B-1(a) (2001). One provision that serves to facilitate the requisite division of power within an administrative agency is N.C. Gen. Stat. § 150B-40(d). It states:

> Unless required for disposition of an ex parte matter authorized by law, a member of an agency assigned to make a decision or to make findings of fact and conclusions of law in a contested case under this Article shall not communicate, directly or indirectly, in connection with any issue of fact or question of law, with any person or party or his representative, except on notice and opportunity for all parties to participate. This prohibition begins at the time of the notice of hearing. *An agency member may communicate with other members of the agency* and may have the aid and advice of the agency staff *other than the staff which has been or is engaged in investigating or prosecuting functions* in connection with the case under consideration or a factually-related case.

N.C.G.S. § 150B-40(d) (2001) (emphasis added). This section breaks down into two parts: (1) An agency member involved in the decision-making process may only communicate with another "person or party or his representative" after the notice of hearing has been issued if that member provides all parties with notice and an opportunity to participate in the communication; and (2) regardless of whether a notice of hearing has been issued or the parties have received notice of the intended communication, a decision-making member may communicate with other members of the agency at any time unless those other members are or were engaged in the investigation or prosecution of the case or a factually-related case. In other words, the decision-making member is prohibited from having any communications with the investigating or prosecuting members of the agency before and after the notice of hearing.[1]

In this case, the Board met with the investigator prior to the issuance of the notice of hearing to discuss his findings and conclusions in respect to this case. This communication was in direct viola-

---

1. Any interpretation of section 150B-40(d) prohibiting communications with an investigating or prosecuting member of the agency only after issuance of the *notice of hearing* would be nonsensical as there is no justification for allowing communications with those agency members before a notice of hearing has been issued but not thereafter.

tion of section 150B-40(d) and thus requires the Board's decision to be reversed.[2]

## II

### Disqualification Procedure

In any event, the Board's failure to comply with the proper disqualification procedure mandates reversal of its decision. Petitioner filed a verified petition for disqualification of the Board members. In his petition, petitioner alleged the Board had met with the investigator in October 1998 to discuss the investigator's report. While a copy of the minutes of this meeting reflected the Board's decision to proceed with the charges against petitioner, it revealed nothing about the content of the Board's communication with the investigator. Petitioner further alleged "[t]here [were] specific and unique events related to this case and discussed with the Board which the Board members [would] remember when this case [was] heard." Moreover, "the Board members . . . [were] likely to have already drawn conclusions and opinions as to what [were] and [were] not the facts and circumstances surrounding . . . the alleged conduct in this matter and [were] irrevocably biased such that they [could not] provide a fair and impartial hearing." In order to explore the alleged bias of the Board, petitioner requested an opportunity to *voir dire* the Board. The Board considered the petition and, after having been polled for bias by an appointed investigator, denied the petition without affording petitioner an opportunity to *voir dire* the individual members of the Board.

Pursuant to section 54.2308 of the North Carolina Administrative Code, a party may petition for the disqualification of a Board member upon belief that the Board member "is personally biased or otherwise unable to conduct or participate in the hearing and perform all duties in an impartial manner." 21 N.C.A.C. 54.2308(b) (2002); N.C.G.S. § 150B-40(b) (2001) (a party must "file[] in good faith a timely and sufficient affidavit of the personal bias or other reason for disqualification of any member of the agency"). The party alleging bias "must state all facts [he] deems relevant to the disqualification of a Board member." 21 N.C.A.C. 54.2308(c) (2002). The Board then "shall decide whether to disqualify the challenged individual"; however, "[t]he person whose disqualification is to be determined will not

---

2. This opinion does not prohibit administrative agencies from appointing a Board member to engage in the investigation or prosecution of a case so long as that member recuses himself from any participation in the adjudicative process.

participate in the decision." 21 N.C.A.C. 54.2308(e)(2)-(3) (2002). Accordingly, the procedure set forth in section 54.2308 is inoperable if bias of every member of the Board is alleged. When the Board is presented with such a scenario, the matter must be referred to an administrative law judge. *See* N.C.G.S. § 150B-40(e) (2001) ("[w]hen a majority of an agency is unable . . . to hear a contested case, the agency shall apply to the Director of the Office of Administrative Hearings for the designation of an administrative law judge to preside at the hearing"). Thus, the Board erred in failing to refer the determination of bias of the whole Board to an administrative law judge.

I would further note that upon review by an administrative law judge, petitioner, having in good faith alleged the facts leading to the potential bias of the Board, has the right to *voir dire* the individual Board members. *See* N.C.G.S. § 150B-40(a) (2001) ("[h]earings shall be conducted in a fair and impartial manner"); *Crump v. Bd. of Educ.*, 326 N.C. 603, 624, 392 S.E.2d 579, 590 (1990) (it is a fundamental aspect of due process that " 'both unfairness and the appearance of unfairness should be avoided' "). While it has been held that an administrative agency's involvement in both the investigation and the adjudication of a case does not *per se* violate due process, *see Hope*, 110 N.C. App. at 603-04, 430 S.E.2d at 474-75, a petitioner, if his factual allegations are made in good faith, must be allowed to explore the potential for bias that is inherent in the conflicting roles often assumed by administrative agencies, *see Withrow v. Larkin*, 421 U.S. 35, 58, 43 L. Ed. 2d 712, 730 (1975) (substantial due process question raised if a "fair and effective consideration at a subsequent adversary hearing leading to [the agency's] ultimate decision" is "as a practical or legal matter foreclosed"); N.C.G.S. § 150B-40(b). The subsequent determination of actual bias must necessarily involve an opportunity to *voir dire* the individual Board members, as the party alleging bias will be essentially barred from meeting his burden of proof if he is prevented from engaging in such an examination.[3] *See Crump*, 326 N.C. at 617, 392 S.E.2d at 586 (holding that "because of their multi-faceted roles as administrators, investigators and adjudicators, school boards are vested with a presumption that their actions are correct, and the burden is on a contestant to

---

3. The majority finds significance in the fact that the Board, when polled by the appointed investigator, denied having any memory of the original review of the facts that would prevent a fair and impartial decision. Petitioner, however, alleged "the Board members . . . [were] likely to have already drawn conclusions and opinions as to what [were] and [were] not the facts and circumstances surrounding . . . the alleged conduct in this matter." This issue was not addressed by the polling of the Board and petitioner should have been given an opportunity to explore it.

prove otherwise"). This is especially true if, as in this case, no transcript or record exists of the communication that allegedly led to the Board members' bias.

## Conclusion

As the Board's communication with the investigator in October 1998 was in violation of section 150B-40(d), I would affirm the trial court's order reversing the Board's decision. Even if section 150B-40(d) did not mandate reversal of the Board's decision, the Board's failure to refer petitioner's allegations of the bias of the whole Board to an administrative law judge constitutes an alternative error warranting reversal of its decision.